**HOL-GAR MANUFACTURING CORP.**

v.

**The UNITED STATES.**

No. 199-60.

United States Court of Claims.
Jan. 22, 1965.

Theodore M. Kostos, Philadelphia, Pa., for plaintiff.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz, with directions to make findings of fact and recommendations for a conclusion of law. The commissioner has done so in an opinion and report filed on July 10, 1963. The plaintiff has excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been argued orally. Since the court agrees with the commissioner's findings, his opinion and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

Plaintiff, a Pennsylvania corporation engaged exclusively in manufacturing generator sets and other equipment for agencies of the Government, was, as low bidder, awarded a contract in March 1958 to supply 5500 portable generator sets to the U. S. Army Corps of Engineers. A supplemental agreement was entered into by the parties in June 1958 increasing the contract by 1,375 units, for a total quantity of 6,875 sets. The unit price of the sets was $1,050; the total contract amount, $7,225,625. Plaintiff sues for the extra cost involved in equipping each generator set with thermostatically operated shutters (a device to control automatically the passage of air from the engine cooling system radiator through the front opening of the generator housing). It claims that such shutters were not required by the specifications but were insisted upon by the defendant's contracting officer and, therefore, constituted a change in the contract. An administrative appeal by plaintiff to the Armed Services Board of Contract Appeals was unsuccessful.

The specification governing the contract in question was MIL–G–12373, dated December 9, 1952, as amended by Amendment 2, dated August 21, 1957. Item 10 of the amended specification entitled "Housing" read as follows:

Suitable opening for the engine cooling system radiator, with thermostatically operated shutters having auxiliary manual control; substan-

tial protective grill to protect shutters.[1]

Item 22 of the amended specification entitled "Cooling system" read as follows:

Liquid cooling, with pusher-type fan (grille not required) for radiator. Thermostatic control for shutters, with auxiliary manual control. Manually adjustable doors in housing to control air flow.[2]

■ Against this background the principal issue here is whether these provisions, on their face, required plaintiff to equip the generator sets manufactured under the contract with thermostatically operated shutters for the engine cooling system radiator. The dispute, turning as it does on an interpretation of the language of the contract specifications, is a legal question on which the administrative ruling of the contract appeals board is not final as against the plaintiff, nor binding on this court. See 41 U.S.C. § 322; Edwards Eng. Corp. v. United States, 161 Ct.Cl. 322, 328 (1963) and cases cited; Beacon Construction Co. v. United States, 314 F.2d 501, 502, 161 Ct.Cl. 1, 3 (1963) and cases cited; Guyler v. United States, 314 F.2d 506, 509, 161 Ct.Cl. 159, 165 (1963). See also River Construction Co. v. United States, 159 Ct.Cl. 254, 262–266 (1962).[3]

At the outset it would appear that the plain language of Item 10 of the specification, as amended, required the inclusion of thermostatically operated shutters on the generator sets, in conjunction with the opening for the engine radiator. For that Item, to repeat, requires:

Suitable opening for the engine cooling system radiator, with thermostatically operated shutters having auxiliary manual control; substantial protective grill to protect shutters.

There is the further consideration that Item 10 of the original specification called for a "Suitable opening with substantial, manually controlled doors for the engine cooling system radiator; grille not required." There seems no doubt that the Item as so worded imposed a positive requirement for manually controlled doors for the radiator. Merely by comparing the language of the original and amended specification, it seems clear that Amendment 2 modified the original Item 10 so as to require (1) thermostatically operated shutters rather than manually controlled doors for the radiator; (2) an auxiliary manual control for the shutters; and (3) a grille to protect the shutters.[4] It also seems apparent that Item 22 of the amended specifica-

---

1. As originally issued on December 9, 1952, Item 10 of the specification read in part: Suitable opening with substantial manually controlled doors for the engine cooling system radiator; grille not required.

2. Item 22 of the original specification remained unchanged by Amendment 2.

3. In United States v. Carlo Bianchi, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the Supreme Court recently held that in a suit governed by the Wunderlich Act (41 U.S.C. §§ 321–322) this court is restricted to a review of the administrative record on issues of fact submitted to administrative determination. Since the basic question here involves a question of law, not an issue of fact, the Bianchi holding is, of course, not applicable.

4. Plaintiff says that such comparison is inappropriate, contending that the requirement for manually controlled doors in the

basic specification was contained not in Item 10 but rather in the third sentence of Item 22, "Manually adjustable doors in housing to control air flow." The reason, according to plaintiff, is that although Amendment 1, dated August 3, 1953, deleted the requirement in Item 10 for manually controlled doors, nevertheless sets manufactured by plaintiff under that Amendment, with a manually controlled door over the radiator, were accepted by defendant. In these circumstances, it is maintained that the requirement for manually controlled doors for the radiator opening must have been contained in Item 22 and that the reference to a manually controlled door in Item 10 was superfluous. as was the reference to thermostatically operated shutters in Amendment 2 of that Item. The contention is subject to several infirmities. In the first place, as discussed below, the term "Manually adjustable doors in housing to control air flow" relates to the doors at the

tion contained a complementary requirement; i. e., "Thermostatic control for shutters, with auxiliary manual control." Such controls for the shutters were called for by the original specification as well; but since that specification imposed no requirement for the shutters themselves, Government representatives did not insist on installation of the control mechanism since it would be superfluous. But after issuance of Amendment 2 specifying a shutter requirement, this no longer was the case.

■ Having been furnished the original specification and Amendment 2 as enclosures to the Bid Invitation, and having read Item 10 and the amendment thereto, it is somewhat difficult to perceive how plaintiff, as an experienced Government contractor in the manufacture of generator sets, could have concluded that thermostatically operated shutters were not required. Indeed it is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances. New York Trust Co. v. Island Oil & Transport Corp., 34 F.2d 655, 656 (2d Cir. 1929); Hammond Ford, Inc. v. Ford Motor Co., 204 F.Supp. 772, 773 (S.D. N.Y.1962); 4 Williston, Contracts, § 611 at 553 (3d ed. 1961).[5]

Plaintiff insists, however, that Item 10, as amended, imposed no positive requirement for thermostatically operated shutters. It maintains that the comma after the word "radiator" should be disregarded and that if disregarded, the term "with thermostatically operated shutters" modifies the word "radiator". In short, in plaintiff's view, Item 10, as amended, requires merely a suitable opening for an engine cooling system radiator having thermostatically operated shutters. To support this contention, plaintiff adverts to the second sentence in Item 22 "Thermostatic control for shutters, with auxiliary manual control" and asserts that the term "with auxiliary manual control" in that sentence modifies the word "shutters" and that the sentence must, therefore, be read as though there were no comma after the word "shutters". It then argues that since this sentence is grammatically similar to the sentence in Item 10, "Suitable opening for the engine cooling system radiator, with thermostatically operated shutters having auxiliary manual control * * *", the latter sentence should likewise be read as if there were no comma after the word "radiator". This means, according to plaintiff, that the Item 10 sentence requires only a "Suitable opening."

side of the housing. Second, while Amendment 1 may have been deficient in not containing a specific requirement in Item 10 for doors or shutters over the radiator opening (see infra), that amendment constituted no part of the present contract specifications. On the contrary, it was superseded by Amendment 2 which was in nowise cumulative with, or dependent upon, Amendment 1, but directly amended the basic specification so that it is quite appropriate to compare the language of Item 10 in the original specification with the change made by Amendment 2.

5. Plaintiff had a period of six weeks to consider the language of the new specification. Though aware of the new Item 10 provision, it made no effort to consult with Government representatives to find out whether it required thermostatically operated shutters. However, the Invita-

tion to Bid here was not accompanied by a "notice to bidders" providing them an opportunity to obtain interpretation of specifications from Government representatives before submitting their bids. Had such notice been included, failure to seek such interpretation before the bid submission might well have served in and of itself as a bar to recovery. Beacon Construction Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7, and cases cited, (1963). Be that as it may, it is unnecessary in deciding this case to determine whether plaintiff—even in the absence of such a "notice" provision—still had an affirmative obligation in the circumstances to seek an interpretation from Government representatives as to the meaning of the Item in order to take advantage of any claimed ambiguity therein. Cf. Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 328–329 (1958).

■ There are several difficulties with this argument. In the first place, the reasonable construction of the Item 22 sentence is that a thermostatic control and an auxiliary manual control are both required for the shutters so that a comma after the word "shutters" in that Item is grammatically proper. Furthermore, "(p)unctuation is a most fallible standard by which to interpret a writing; it may be resorted to when all other means fail; but the Court will first take the instrument by its four corners, in order to ascertain its true meaning; if that is apparent, on judicially inspecting the whole, the punctuation will not be suffered to change it." Ewing's Lessee v. Burnet, 11 Pet. (36 U.S.) 41, 9 L.Ed. 624 (1837). See also, Hughes v. Samedan Oil Corp., 166 F.2d 871, 873 (10th Cir. 1948); Travelers Indemnity Co. v. Pray, 204 F.2d 821 (6th Cir. 1953). But even assuming that the inclusion of a comma in the second sentence of Item 22 was incorrect, this would not constitute sufficient reason to conclude that a similar grammatical error should be read into Item 10. Certainly an improper grammatical construction of one item in a specification affords no justification to accord the language of another item— i. e., Item 10—a meaning other than that conveyed by the language actually used. In construing a contract, the language of the instrument is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise. Breese Burners, Inc. v. United States, 121 F.Supp. 530, 535, 128 Ct.Cl. 649, 658–659 (1954); Kronner v. United States, 110 F.Supp. 730, 734, 126 Ct.Cl. 156, 163 (1953); Eddy v. Prudence Bonds Corporation, 165 F.2d 157, 161 (2d Cir. 1947), cert. denied 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948); Prudential Insurance Co. of America v. Nelson, 101 F.2d 441, 444 (6th Cir. 1939), cert. denied 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 489 (1939). No such contrary intent is present here and, as written, the phrase "with thermostatically operated shutters" in Item 10 modifies "Suitable opening" not "the engine cooling system radiator" so that the provision calls for "Suitable opening * * * with thermostatically operated shutters"—language clearly requiring shutters.

What is more, were plaintiff correct that Item 10, as amended, requires merely a suitable opening, then the sentence would read: "Suitable opening for the engine cooling system radiator *and for* thermostatically operated shutters * * *." (Emphasis added.) But that is not what the Item says. The point is that the construction urged by plaintiff would simply write out of the specification the word "with". This, in turn, would do violence to the entire meaning of the Item inasmuch as the word "with", especially in the context in which it was used, quite clearly denoted that not only was a suitable opening to be provided for the radiator, but also that shutters were to be provided in conjunction therewith. "Of course, almost any word or group of words can be twisted, by strained construction, into an 'ambiguity'." Aero Mayflower Transit Co. v. United States, 162 Ct.Cl. 233, 237 (1963).

Further, Item 10, as amended, requires a "substantial protective grill to protect shutters." Since plaintiff concedes that such a grill was required, the interpretation it urges would require a suitable opening for the shutters and a grill to protect the shutters, but no shutters. This hardly appears logical; for while it would be technically possible to install shutters after completion of the generator, this would necessitate removal of the protective grill from the housing to which it is bolted, removal of the manual doors (which plaintiff contends were all that were required), attachment of the shutter component to the housing and replacement of the protective grill. Considering that a generator set costs the Government $1,050, and the shutters about $24.00 per unit, it would scarcely make sense to assume that the Government would contemplate incurring the expense for the substantial removal and replacement work needed to install the shutters at a later date when the shutter unit could have been installed initially at a cost of $24.00.

Plaintiff next states that the second sentence in Item 22 "Thermostatic control for shutters, with auxiliary manual control" in the original specification was unchanged by Amendment 2. It argues that prior to Amendment 2 the Government—despite the specification requirement for "Thermostatic control for shutters, * * *"—accepted thousands of generator sets manufactured by it which were equipped with only a manually controlled door; that this prior conduct and usage established that the words "Thermostatic control for shutters" legally, and in fact, meant manually controlled doors; and that this meaning of the words carried over into and became part of Amendment 2. This contention can not be accepted. Apart from the difference in language between "with thermostatically operated shutters" and "Thermostatic control for shutters", defendant's representatives did not gainsay the fact that the specifications that were in effect prior to Amendment 2 required a thermostatic control for the shutters: Their position was that a thermostatic control had to be provided for the shutters should shutters be required by the specification, but that since the specifications (prior to Amendment 2) did not contain a shutter requirement, it would be superfluous to provide a thermostatic control for nonexistent shutters. This is far different than interpreting the term "Thermostatic control for shutters" to mean manually controlled doors, as plaintiff maintains. Equally important, plaintiff's interpretation would make a nullity of those provisions of Item 10, as amended by Amendment 2, dealing with thermostatically operated shutters.

Plaintiff also insists that the indefiniteness of the specifications in respect to the details for the construction and operation of shutters is further indication that thermostatically operated shutters were not required by the contract.

The decision of the ASBCA is persuasive as to this contention:

· We have also considered the lack of definiteness in the specifications as to the size, shape, operating temperatures, etc., of the thermostatically operated shutters. We can see how such a lack of definiteness could present problems to a bidder in computing its bid, could result in various designs by various bidders, and could result in the delivery of an item in which the thermostatically operated shutters complied with specifications (i. e., contract requirements) but nonetheless did not meet the Government's requirements. We are not persuaded, however, that it is the custom or usage in the field to omit from an item any component thereof for which details of construction, design, operation and test are omitted. We can see how the absence of such details might lead one not to bid because of uncertainties with respect to the thermostatically operated shutters to be furnished and attendant difficulties in computing the cost to be included in the bid, but we are not persuaded that one can reasonably solve those difficulties and uncertainties by a decision that such shutters are not required at all. We can see that in some cases contractors might prefer to be told not only what is required but also in detail how to accomplish it, but we are familiar with no rule requiring such detail and believe that the working out of such matters can often best be left up to responsible contractors. In this connection we note that the specifications in this case (MIL–G–12373 as amended) are performance type specifications and in many areas do not contain construction and operational details.[6]

6. "(A)n end-product specification normally leaves it to the contractor to perform as best he can." Helene Curtis Industries v. United States, 312 F.2d 774, 778, 160 Ct.Cl. 437, 443, and cases cited, (1963).

Plaintiff says that even if Amendment 2 to Item 10 established a requirement for thermostatically operated shutters, it was in conflict with the third sentence in Item 22 reading "Manually adjustable doors in housing to control air flow", particularly since it would be incongruous from an engineering standpoint for a generator set to be equipped with both thermostatically operated shutters and a manually controlled door over the radiator opening. This conflict, it is urged, created an ambiguity in the contract which must be resolved against the defendant which drafted the instrument. Defendant argues, on the other hand, that there is no conflict, asserting that the term "Manually adjustable doors in housing to control air flow" refers not to the door over the radiator opening but to the other doors in the set; i. e., the air-intake doors and the side doors (see finding 17).

Plaintiff advances three reasons as to why the language in Item 22 "Manually adjustable doors * * * to control air flow" refers to a door over the radiator opening rather than the other doors in the set. First it observes that Item 10, as amended by Amendment 2, requires "one air-intake door on each side of housing near the radiator for low ambient temperature cooling" and then argues that if Item 22 refers only to those doors it would be surplusage. There is no doubt that Item 10 specifically required air-intake doors; it also required hinged side covers; i. e., doors at the side of the housing which serve as air intakes and also provide access to the inside of the set (see findings 17 and 18). While repetitive, it is not unreasonable that the requirement for air intake and side doors are contained in both Items 10 and 22. Item 10 deals with the construction of the "Housing"; Item 22 relates to the "Cooling system". In fact, the air-intake doors and the side covers are not only part of the housing system, they are also part of the cooling system as well, since they serve as air intakes for cooling the set. In view of this consideration, there is rational basis for including require-

ments pertaining to these doors in the two sections of the specifications.

Second, plaintiff argues that the third sentence of Item 22 "Manually adjustable doors in housing to control air flow" must refer to a door over the radiator opening rather than the air-intake door and side cover because the front door is the only one that "controls" the airflow over the radiator. It is correct that no air would pass over the radiator if the front door were closed. Also, because the set is not completely airtight, some air could pass through the radiator with the other doors closed if the front door were open. The set was designed, however, to take air in through either or both the air-intake doors and the side covers and to pass air out through the front opening. Thus all three openings are integral parts of the airflow system which operate in combination to produce airflow control. In light of such consideration, a reasonable construction of the specifications warrants the conclusion that the language "Manually adjustable doors in housing to control air flow" refers to the air-intake doors and the side covers.

Plaintiff's third argument as to why Item 22 presents a positive requirement for a manual door over the radiator opening relates to Amendment 1 of the original specifications. Item 10 of the basic specification provided:

Suitable opening with substantial, manually controlled doors for the engine cooling system radiator; grille not required.

Amendment 1 to the basic specification deleted the above-quoted language of the basic specification. Amendment 2, by contrast, deleted the above-quoted language of the original specification and substituted the following:

Suitable opening for the engine cooling system radiator, with thermostatically operated shutters having auxiliary manual control; substantial protective grill to protect shutters.

It is against this background that plaintiff observes that while Amend-

ment 1 was in effect, it manufactured and delivered 5 KW generator sets to the Government with a manually controlled door over the radiator opening. Since there was no requirement for such a door in Item 10 of Amendment 1, plaintiff argues that the requirement for such a door must have been contained in the third sentence of Item 22. It then insists that if Item 22 required a manual door over the radiator opening when Amendment 1 was in effect, then the Item still required a manual door under Amendment 2 since that Item itself was in no way changed by the latter Amendment.

This argument is not persuasive. Under the basic specification the third sentence of Item 22 "Manually adjustable doors in housing to control air flow" did not in and of itself create a requirement for a front door; this is because Item 10 specifically required a "Suitable opening with substantial, manually controlled doors for the engine cooling system radiator." Beyond that, under Amendment 2 "Manually adjustable doors in housing to control air flow" specified by Item 22, refers, as previously indicated, to the air-intake doors and side covers. Therefore, both under the basic specification and Amendment 2, the third sentence of Item 22 describes items already required by Item 10. It may well be that Amendment 1 was deficient in failing to provide in Item 10 for a device to control the discharge of air from the radiator opening. And since such a control device is manifestly necessary for operation of a generator, it could well be that plaintiff would have been justified under the Amendment in providing whatever type of control mechanism it thought desirable—either manually or automatically operated. But the issue here does not concern Amendment 1; that Amendment was superseded by, and the present controversy arises under, Amendment 2. Any deficiency or ambiguity in the prior Amendment as to what type of device should be provided over the radiator opening has been eliminated by the Item 10 requirement in

Amendment 2 for thermostatically operated shutters.

In construing Item 10 in conjunction with Item 22, the intention of the parties must be gathered from the whole instrument. City of New York v. United States, 113 F.Supp. 645, 647, 125 Ct.Cl. 576, 580 (1953); Loftis v. United States, 76 F.Supp. 816, 826, 110 Ct.Cl. 551, 628 (1948). Also, an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible. Bethlehem Steel Co. v. United States, 75 Ct.Cl. 845, 868 (1932); P. Sanford Ross, Inc. v. United States, 50 Ct.Cl. 168, 174 (1915); Fred R. Comb Co. v. United States, 100 Ct.Cl. 259 (1943); New Wrinkle v. John L. Armitage & Co., 238 F.2d 753, 757 (3d Cir. 1956); Meighan v. Finn, 146 F.2d 594, 595 (2d Cir. 1944), affirmed 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945); Cities Service Gas Co. v. Kelley-Dempsey & Co., 111 F.2d 247, 249 (10th Cir. 1940); F. W. Woolworth Co. v. Peterson, 78 F.2d 47, 48 (10th Cir. 1935); 4 Williston, Contracts, § 619 at 731 (3d ed. 1961); 2 Sutherland, Statutory Construction, § 4705 (3d ed. 1943). Applying these principles, the reasonable construction of the third sentence of Item 22, "Manually adjustable doors in housing to control air flow", is that it is descriptive of the air-intake doors and side covers required by Item 10 and is, therefore, not in conflict with the Item 10 requirement for thermostatically operated shutters.

Further, Item 10 specifically delineates the place in the set where the shutters were to be located; that is to say, they were required to be installed at the opening in the housing for the radiator. The third sentence of Item 22, on the other hand, is general in its terms since it contains no requirement as to where the doors were to be located. Con-

sequently, even if Item 22 were construed as relating to the door for the radiator, the Item 10 requirement for shutters would, as a matter of contract construction, still control in accordance with the settled rule that where an agreement contains general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms. Smoot v. United States, 237 U.S. 38, 35 S.Ct. 540, 59 L.Ed. 829 (1915); Callahan Constr. Co. v. United States, 91 Ct.Cl. 538, 634 (1940); Fernandez v. Rickert Rice Mills, 119 F.2d 809, 817, 136 A.L.R. 351 (1st Cir. 1941).