**W.M. SCHLOSSER CO., INC.,**
Appellant,

v.

**The UNITED STATES, Appellee.**

Appeal No. 85–746.

United States Court of Appeals,
Federal Circuit.

June 28, 1985.

Nichols, Senior Circuit Judge, filed dissenting opinion.

---

Joseph C. Kovars, Braude, Margulies, Sacks & Rephan, Chartered, Washington, D.C., argued for appellant.

Thomas J. Rappaport, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen.

Gerald L. Schrader, Trial Counsel, General Services Admin., Washington, D.C., of counsel.

Before BENNETT, Circuit Judge, NICH-OLS, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

This is an appeal from a decision of the General Services Board of Contract Appeals (board), 84–3 BCA ¶ 17,610, denying a claim by W.M. Schlosser Company, Inc. for the cost of preparing certain drawings in connection with a building renovation contract. The board determined that the drawings were required by the express language of the contract and that an initial submittal by Schlosser had not satisfied that provision of the contract. We affirm.[1]

*Background*

On September 28, 1981, the General Services Administration (GSA) awarded Schlosser a contract for miscellaneous repair and improvements at the HEW–North Building in Washington, D.C. at a fixed price of $1,126,738. One aspect of the contract was for the installation of fire/smoke dampers into the building's existing ductwork. The dampers were designed to shut off the air flowing through the ducts in the event of a fire in the building. Since much of the building's ductwork was concealed, bids for the contract were based on "contract drawings" supplied by GSA, depicting what was believed to be the layout and size of existing ductwork. To account for any discrepancies between the actual site conditions and those set forth in the contract drawings, the contract included a standard Change Order clause as well as the following "Measurements" clause:

6. MEASUREMENTS

6.1 *All dimensions shown of existing work* and all dimensions required for work that is to connect with work now in place, *shall be verified by the Contractor by actual measurements of the existing work.* Any *discrepancies* between the contract requirements and the existing conditions *shall be referred to the Contracting Officer before any*

*work affected thereby has been performed.* [Emphasis added.]

The contract also required the following submittals by the contractor:

2. SUBMITTALS

2.1 Manufacturer's Data: Within 15 days after award of contract and before executing any work, six copies of information in the completely marked and coordinated package sufficient to assure full compliance with the contract requirements shall be submitted to the Contracting Officer for approval. Piecemeal submittal of data is not acceptable. Information shall be submitted for all material and equipment the Contractor proposed to furnish for accomplishment of the contract work. Submittals for each manufactured item shall be manufacturer's descriptive literature, equipment drawings, diagrams, performance and characteristic curves, and catalog cuts and shall include the manufacturer's name, trade name, catalog model or number, nameplate data, size, layout dimensions, capacity, specification reference, applicable commercial, Federal and military specification references, and all other information necessary to establish contract compliance.

2.2 Shop Drawings: Within 30 days after award of contract, six copies of consolidated shop drawings in one complete package shall be submitted to the Contracting Officer for approval. The drawing shall be drawn to a minimum scale of ⅛" inch equals $1' - 0"$; shall be a minimum of 8½" × 11" in size; and shall include plans, elevations, and sections of equipment and control spaces identifying and indicating proposed and existing location, layout, and arrangement of items of equipment, control panels, accessories, piping, ductwork, and other items that must be shown to assure a coordinated installation. Drawings also shall indicate adequate clearance for operation, maintenance, and replacement of operating equipment devices. If any equipment is disapproved, drawings shall be revised to

---

**1.** Our jurisdiction rests on 28 U.S.C. § 1295(a)(10).

show approved equipment resubmitted. Piecemeal submittals of drawings or marked-up contract drawings or copies are not acceptable.

## 15. SHOP DRAWINGS

(a) The term "shop drawings" includes drawings, diagrams, layouts, schematics, descriptive literature, illustrations, schedules, performance and test data, and similar materials furnished by the Contractor to explain in detail specific portions of the work required by the contract.

(b) If this contract requires shop drawings, the Contractor shall coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract requirements and shall indicate his approval thereon as evidence of such coordination and review. Shop drawings submitted to the Contracting Officer without evidence of the Contractor's approval may be returned for resubmission. The Contracting Officer will indicate his approval or disapproval of the shop drawings and if not approved as submitted shall indicate his reasons therefor.

Hamilton & Spiegel, Inc. (H & S), to whom Schlosser subcontracted the portion of the contract dealing with installation of dampers, relied entirely on the contract drawings to size individual dampers. H & S sent Schlosser a submittal for the dampers it proposed to install, setting forth the type of damper, its size and location, as well as manufacturer's literature, catalog cuts, and drawings taken from sales brochures on dampers. Schlosser forwarded the submittal to GSA's project architect, identifying it as "Manufacturer's Data." The architect approved the submittal and returned it to Schlosser, marked as a transmittal of "Shop drawings." Schlosser then forwarded the material to H & S, identifying it as approved "Manufacturer's Data." H & S then ordered the dampers.

Upon cutting access openings in the building walls to install the dampers, H & S discovered that the existing site conditions did not correspond in some cases to the specifications of the contract drawings. As a consequence, some of the dampers ordered were incorrectly sized, while others could not be installed due to obstructions. Schlosser notified GSA of this situation and requested instructions on how to proceed. When GSA requested to see the "shop drawings" showing the actual site conditions, it was informed that the subcontractor had made no such drawings. GSA then directed that they be prepared, so that the extent of the problem could be evaluated.

By letter of April 19, 1982, Schlosser advised GSA that H & S had "agreed to provide shop drawings." H & S prepared and submitted to GSA (through Schlosser) detailed drawings of all new damper locations on Mylar transparencies. Schlosser then filed a claim with the contracting officer in the amount of $16,776 for the costs of additional work and materials (including dampers) allegedly incurred as a result of the discrepancies between the contract drawings and the actual site conditions, including the costs associated with preparing the Mylar drawings.

Subsequently, both parties agreed that the Mylar drawings claim would be pursued under a separate change order. The contracting officer then authorized payment of $9,600 of the original $16,776 claim for the additional labor and materials required to modify existing ducts and to replace dampers which H & S had ordered, but which were not the right size. Schlosser then submitted a separate claim for the costs of preparing the Mylar drawings in the amount of $19,762. The contracting officer denied the claim on the basis that appellant was obligated to provide these drawings under the "shop drawing" requirement specified in paragraph 2.2 of the contract.

The board affirmed the decision of the contracting officer, holding: (1) that the contract drawings carried no implied warranty of accuracy; (2) that the initial submission to GSA did not comply with the contract's shop drawing requirement; and (3) that the Mylar drawings submitted per GSA's request merely satisfied the shop

drawing requirement and, therefore, did not entitle Schlosser to a cost adjustment.

### Analysis

■ The above issues decided by the board, and now contested again on appeal, primarily involve contract interpretation and are, therefore, reviewable as a matter of law. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916–17 (Fed.Cir.1984); 41 U.S.C. § 609(b) (1982). Underlying factual determinations must be upheld if supported by substantial evidence. 41 U.S.C. § 609(b) (1982).

Appellant first attacks the board's holding that the contract drawings did not carry an implied warranty of accuracy. Appellant's position is that, when the government, as here, issues a set of detailed specifications on which bids are to be based, there is an implied warranty that the specifications, i.e., contract drawings, are accurate. This warranty, according to appellant, cannot be abrogated by the presence of the Measurements clause in paragraph 6.1, requiring the contractor to verify dimensions by actual measurement. Appellant argues that, if the contract drawings do not carry an implied warranty of accuracy, the risk of differing site conditions falls entirely on the contractor. Appellant goes on to predict that contractors, with the "onus of design errors" upon them, would be forced to add contingencies to their bids, resulting in higher contract procurement costs for the government.

The government, on the other hand, asserts that the contract drawings carried no warranty of accuracy, that the Measurements clause clearly put appellant on notice that the drawings could not be assumed to be accurate, and that the contract's Change Order provision was designed to protect the winning bidder from any inaccuracies in the contract drawings. On that point, Mr. Steele, Project Officer for GSA, testified as follows:

> The contract drawings show a duct size so that all of the bidders bid on one thing, in my opinion. It would be cumbersome to have 26 bidders trooping through the building if we didn't show duct sizes and saying: I have to field measure all these ducts before I can even give you a bid, Mr. Government.
>
> So our AE firms take the best information they have [, such] as bills from previous contractors, and they put them on a set of contract drawings. That's the basis that everybody bids on. When you're the successful bidder, then you go in and do your field measuring.
>
> And if there's any difference between what we represented and what actually is there, it is brought to the government's attention and any major differences are handled by added or deducted change orders.

The above testimony supports the government's position that the contract drawings were intended to be used solely as a bidding tool to put bidders on an equal footing and to avoid the disruption of the workplace which would have occurred had each potential bidder sought to take individual measurements of the site. Once the contract was awarded, the successful bidder, i.e., Schlosser, was under an obligation, pursuant to the Measurements clause of the contract, to actually inspect the site prior to performing any work. If discrepancies between the contract drawings and actual measurements occurred, as some did here, the contractor was entitled to an equitable adjustment to the extent that it incurred costs not reflected in its bid. Thus, the Measurements clause and the Change Order provisions of the contract were specifically designed to work together to *avoid* placing the "onus of design errors" on the contractor. Both Schlosser and the government acted on this understanding. Schlosser submitted a claim for labor and materials where such discrepancies with the contract drawings occurred, and the government, by a change order, paid the increased cost of ductwork dampers in such instances.[2] The govern-

---

**2.** The government's reimbursement for some of these costs, particularly for replacing incorrect-ly sized dampers, appears, in fact, to have been overgenerous. Had appellant taken measure-

ment has only refused to pay anything above the contract price for the drawings, which it asserted were required under the original terms of the contract.

In any event, the "issue" of whether the contract drawings carried an implied warranty of accuracy appears to be entirely irrelevant to appellant's right to recovery. Even if we assume that appellant properly relied on the dimensions set forth in the contract drawings with respect to ordering equipment, appellant, nevertheless, was clearly obligated under the contract to submit shop drawings. Thus, *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) and other authority cited by appellant are distinguishable. The costs of the shop drawings are costs appellant contractually assumed and, as the board held, were not attributable to defective specifications.

Appellant asserts that, but for the problem of differing site conditions, the government never would have required the Mylar drawings. While, in fact, these drawings were demanded by the government only after the discrepancies between the existing conditions and contract drawings were discovered, appellant was at all times under an unequivocal obligation to prepare shop drawings, even if the contract drawings had been 100% accurate. That GSA might never have insisted upon submission of the shop drawings had problems not arisen is simply not dispositive.

■ Thus, in our view, the only genuine issues in this case are: (1) whether Schlosser satisfied the "shop drawing" requirement by its initial submittal to GSA, and (2) whether the Mylar drawings were no more than a fulfillment of this contractual obligation.

With respect to the first issue, appellant claims its initial submission to GSA falls within the broad definition set forth in paragraph 2.2 of the contract. We note, however, that paragraph 2.2 expressly requires that shop drawings include: "Plans, elevations, and sections of equipment *and control spaces identifying and indicating proposed and existing location, layout, and arrangement of items of* equipment, control panels, accessories, piping, *ductwork,* and any other items that must be shown to assure a coordinated installation." (Emphasis added.) Appellant's initial submission to GSA, on the other hand, shows only the dampers themselves. The board found that the drawings in the initial submittal were not shop drawings as required by paragraph 2.2 but rather were intended to be a submittal of Manufacturer's Data as required by paragraph 2.1 that calls for, *inter alia,* "manufacturer's descriptive literature," "equipment drawings," and "catalog cuts." Under appellant's theory, the initial submission would satisfy the contract provisions of both paragraphs 2.1 and 2.2. Such a construction is unreasonable as it would render contract language superfluous. *See, e.g., Ball State University v. United States*, 488 F.2d 1014, 1016, 203 Ct.Cl. 291 (1973); *Hol-Gar Manufacturing Corp. v. United States*, 351 F.2d 972, 979, 169 Ct.Cl. 384 (1965). The nature of the material, as well as appellant's designating it as "Manufacturer's Data" in forwarding the material to GSA's architect and, after the architect erroneously marked it as "Shop drawings," continuing to identify the material as "Manufacturer's Data," constitutes substantial evidence in support of the board's finding.

We also agree with the board that, under the circumstances here, GSA's approval of the initial submission, even if it had been of

---

ments and prepared shop drawings showing the actual existing ductwork layout before ordering the dampers, it most probably would have avoided some of the cost of dampers which were ordered but were the wrong size. Only the cost for items such as larger or additional dampers not contemplated by the original contract drawings would have been necessary, along with costs for unexpected installation problems arising from differing site conditions. The Mea-

surements clause, in fact, expressly requires the contractor to verify the existing measurements and notify the Contracting Officer of any discrepancies between the contract requirements and the actual conditions *"before* any work affected thereby has been performed." (Emphasis added.) H & S clearly violated this provision by ordering the dampers from the manufacturer prior to any inspection of the site.

shop drawings, would not constitute a waiver nor would it estop the government from demanding that the shop drawings contain all specified requirements. Paragraph 19.8 of the contract expressly states that "[a]pproval of drawings and schedules will be general and shall not be construed as permitting any departure from the contract requirements." Thus, the simple fact of GSA's approval would not have relieved appellant from fulfilling its obligations under the contract.

With respect to the second issue, appellant contends that compliance with the shop drawings provision was required by its terms only in instances where a number of trades were employed in order "to assure a coordinated installation." In this installation, no coordination was required and, thus, no shop drawings were necessary, per appellant, which leads to its conclusion that the Mylar drawings are not shop drawings. This argument appears to confuse the mandatory shop drawing requirement with a separate requirement for coordination drawings (paragraph 9.4 of the contract) that is expressly contingent upon two or more trades doing work which might interfere with one another. Indeed, the presence of a separate coordination drawing clause indicates that the shop drawings and coordination drawings do not serve the same purpose.

### Conclusion

Having considered the above and all other of appellant's arguments, we conclude that appellant's submission of Mylar drawings showing the existing location and layout of the ductwork merely fulfilled the shop drawing requirement under the contract, a requirement that had not been satisfied by appellant's previous submittal to GSA. Therefore, the board's decision denying appellant's claim for the cost of preparing the Mylar drawings is *affirmed*.

AFFIRMED.

NICHOLS, Senior Circuit Judge, dissenting.

Respectfully, I dissent. The contract involved numerous items of work, to all of which the quoted clauses applied. It is not surprising that they fitted some items but awkwardly and with ambiguity, and I read the "shop drawing" clause, 2.2, and the definition of "shop drawings," 15, as ambiguous as applied to the commitment to install smoke dampers in the duct work. The Mylar drawings really portrayed existing site conditions that were concealed until access openings were cut, and not what work was to be done, or equipment to be installed. The parties practically treated the submission of manufacturer's drawings as adequate compliance until the GSA seized a chance to cut the equitable adjustment otherwise due. The government called the drawings "shop drawings" with no other justification. If the provision of site drawings was required as "shop drawings," the access opening should have been cut within 30 days to make preparation possible, and then the holes would have gaped open for months, defacing a building that remained in actual use. If Schlosser or its subcontractor had done this, the GSA would have been the first to express outrage.