**DAWCO CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 429–86C.**

United States Claims Court.

March 5, 1990.

Richard D. Corona, San Diego, Cal., for plaintiff.

Paul David Langer, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge.

An electrical subcontractor under a contract awarded by the United States through the Department of the Navy for the rehabilitation of a large number of housing units in San Diego, California, encountered numerous allegedly unforeseeable wiring problems in every unit. The subcontractor, at the contractor's instructions, proceeded to correct the problems. Defendant refused to pay an additional sum for the "extra" work because the work was included within the contract. The contractor contended that the "extra" work was not included within the scope of the contract and it, therefore, was entitled to an additive equitable adjustment.

## FACTS

In mid–1983 plaintiff executed a contract with the Navy for total rehabilitation of a 405–unit naval housing project known as Cabrillo–Larkdale.[1] Plaintiff subcontracted with Lo–West Electric, Inc. to perform the electric work required by the contract within the 445 circuit boxes in the 405 units.[2] The contract expressly required Lo–West to install new circuits in each unit and modify others but made no specific mention of pre-existing, not-modified cir-

cuits. As later found, Lo–West installed or modified between one-third to one-half of the circuits in each circuit box.

The General Provisions of the contract, Clause Thirteen, "CONDITIONS AFFECTING THE WORK," required the contractor to take reasonable steps "to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof." Paragraph Twelve of the General Provisions, "PERMITS AND RESPONSIBILITIES," held the contractor solely "responsible for all damages to persons or property that occur as a result of his fault or negligence [t]o take proper safety ... precautions to protect the work, the workers, the public, and the property of others." In addition, Technical Specification 16402 Part 3.1, "Installation," directed plaintiff to comply with all state and local electric codes and "[c]onform with the National Electric Code [NEC]." One section of the NEC bearing directly on this case was paragraph 90–4. It stated:

> Enforcement. This Code is intended to be suitable for mandatory application by governmental bodies exercising legal jurisdiction over electrical installations and for use by insurance inspectors. The authority having jurisdiction of enforcement of the Code will have the responsibility for making interpretations of the rules, for deciding upon the approval of equipment and materials, and for granting the special permission contemplated in a number of the rules. The authority having jurisdiction may waive specific requirements in this Code or permit alternate methods, where it is assured that equivalent objectives can be achieved by establishing and maintaining effective safety.

Prior to bidding, Mr. James Benson, plaintiff, Mr. Douglas Blum, a partner-owner of Lo–West, and representatives of defendant made a site inspection to view the

---

1. *See Dawco Constr. Co. v. United States,* 18 Cl.Ct. 682 (1989), wherein the court addressed landscaping problems that arose under the same prime contract and project.

2. Lo–West is also identified at different times by the parties as Low West and LoWest. For the sake of uniformity, the court will address the subcontractor, Lo–West.

electric panels and outlets to attempt to determine if there were unknown wiring problems that might come to bear on the work. When Messrs. Benson and Blum arrived on the site they viewed only two panels out of the 445.[3] Mr. Blum simply opened the panel door which permitted him see only the circuit breaker toggles and the directory card.[4] Mr. Rudin, the other partner-owner of Lo–West, testified that it was not industry practice to remove the dead front during pre-bid site inspection unless there is some indication in the specifications or drawings of problems in the panel boxes. There was no indication or statement in the contract of wiring or circuit problems in the panel boxes and Mr. Rudin agreed with Mr. Blum that there was no need to look behind the dead front or to see more than the two panels offered for inspection by defendant.

During performance Lo–West discovered numerous conditions in the boxes that it had not anticipated. There were loose hot wires, doubled up circuits on a single circuit breaker (three to four wires attached to the same circuit breaker), some circuit breakers with no wires connected to them, a large number of broken circuit breakers, other forms of improper wiring, and wires with broken or missing insulation. There is no question but that several of the problems encountered were potentially very dangerous. In one especially egregious instance, a plumber received a severe electric shock when a pipe he was working with came into contact with an uninsulated wire, even though the circuit breaker feeding that circuit was in the "off" position. There were also other reported instances of electric shocks to persons working on the project, one involving Mr. Benson.

Lo–West informed plaintiff early in performance of the contract of the discovered conditions and Mr. Benson discussed them with Mr. Richard Thurman, the now-deceased contracts manager assigned to the Cabrillo–Larkdale project. Upon viewing the panel boxes Mr. Thurman agreed that a safety problem existed for the workmen and to leave them uncorrected would be unsafe and constitute violations of the state electrical code and the NEC. At the least, Mr. Thurman orally directed plaintiff to correct the dangerous conditions at that time.

Both Mr. Blum and Mr. Rudin described the process by which they performed this task. Mr. Rudin testified that two electricians were required. One would stand by the panel box while the other would roam throughout the unit. All but one of the circuit breakers would be turned off and the "roamer" would seek out the live circuit, i.e., all of the outlets, etc., that were on that one circuit. That process was repeated for each circuit and breaker. The electrician standing by the panel box would then label the breaker on the directory card affixed to the back of the panel door. There were a variety of floor plans and no one panel box was identical to any other. Each panel box served from thirty to fifty outlets within each unit consisting of wall outlets, wall switches, ceiling lights, laundry facilities, fire and smoke detectors, furnaces and other miscellaneous outlets. This tracing and labeling procedure was followed for all circuits and circuit breakers in all of the units, including those circuits not added or modified by plaintiff. Mr. Rudin estimated that it took a total of approximately 1,000 man-hours to completely trace and label all of the circuits in all of the 445 panel boxes. The extra work for which equitable adjustment was sought consisted of "tracing, identifying and labeling" all circuits in each panel box, including those not added or modified.[5]

---

3. The record is clear that defendant would not permit plaintiff to view more than the two panels and refused to let plaintiff remove the dead front to see into the two panel boxes viewed.

4. For the sake of clarity, an electric panel box is made up of three basic components: the door, that when open, exposed only the toggles of the circuit breakers and the directory card or label showing which circuit breaker served which cir-

cuit in the unit; the "dead front" which was screwed to the front of the box and to which the door is hinged; and the panel box itself behind the dead front that contained the wiring and circuit breakers.

5. At trial defendant's expert witness testified that the actual time to perform the task would be but a small fraction of that claimed. After what can be characterized as devastating cross-

The parties met on October 13, 1983 to discuss the wiring problems and other matters which plaintiff had submitted to defendant as claims. In attendance at this meeting were Messrs. Benson, Thurman, Heimerman (plaintiff's quality control officer) and others. The minutes of that meeting were taken by Mr. Heimerman and copies were given to defendant. After discussing the wiring claim for tracing, identifying and labeling all circuits including the pre-existing, not-modified circuits, Mr. Thurman instructed Mr. Benson to provide defendant with a cost proposal for the extra work. Mr. Heimerman's notes indicate that the Resident Officer in Charge of Construction (ROICC) would approve the claim. Defendant did not object to, criticize or suggest corrections to Mr. Heimerman's minutes. Nor did defendant ever object to, or even comment upon the manner in which Lo–West traced, identified and labeled each circuit. Based upon what he heard at the meeting, Mr. Benson instructed Lo–West to continue its work in the units as it had been doing. Defendant argued that the most Mr. Thurman gave at the meeting was tentative approval to continue and a promise that he would seek funding approval, but with no guarantee of success.

On November 7, 1983 plaintiff submitted its cost proposal for the "extra" electrical work to defendant in the amount of $71,653.79, based upon experience gained after tracing, identifying and labeling all the circuits in ninety-seven panel boxes. On February 7, 1984, three months later, Mr. Thurman returned plaintiff's wiring cost proposal with a note that the work was "not required." No reason was expressed in the note though shortly thereafter Mr. Thurman allegedly told Mr. Benson the real reason was that there was no available funding. Notwithstanding Mr. Thurman's February 7, 1984 letter, Mr. Benson instructed Lo–West to continue their work, including tracing and labeling all circuits in the panel boxes because he, as did Lo–West, felt strongly that it was a safety

issue and both would be held accountable per paragraph twelve of the General Provisions of the contract if any person were injured or killed, or if property were damaged. Moreover, Mr. Benson did not cease to pursue the claim with defendant.

The ROICC concluded, over a year later, that Mr. Thurman, at the October 13, 1983 quality control meeting, had given defendant "constructive" direction to proceed in tracing and labeling all circuits and that plaintiff was entitled to an equitable adjustment for extra work done up until the February 7, 1984 letter declaring the work as not needed. The ROICC recommended to the contracting officer an additive equitable adjustment of $7,349 and an eleven-day extension for time for performance *vice* plaintiff's claim of $71,653.79. Plaintiff refused the offer and requested a formal decision by the contracting officer. On February 5, 1986, a year later, the contracting officer denied plaintiff's claim. Thereafter, plaintiff brought suit in this court.

## DISCUSSION

Plaintiff argued that it was required by terms incorporated by reference into the contract to perform the electric work according to the NEC and the state code in a safe manner so as not to present any unnecessary exposure of risk to its employees, those of other contractors, and future residents of the housing units. The only way in which this could be reasonably accomplished, according to plaintiff, was to trace, identify and properly label all of the circuits in each panel box.[6] Both parties agreed by the time of trial that all the circuits in each panel box had to be properly labeled, including those that plaintiff did not specifically add or modify.

When a circuit breaker is placed within a panel box it must be identified on the panel label. Paragraph 110–22 of the NEC, "Identification of Disconnecting Means," stated:

---

examination, defendant's expert begrudgingly admitted that the claimed time was conservatively accurate.

6. It must be noted that plaintiff characterized its claim as "tracing, identifying, and labeling" the circuits. The real issue is not so expansive. Rather, it is what circuits were to be labeled.

Each disconnecting means required by this Code for motors and appliances, and each service, feeder, or branch circuit at the point where it originates shall be legibly marked to indicate its purpose unless located and arranged so the purpose is evident. The marking shall be of sufficient durability to withstand the environment involved.

It was not apparently possible, or desireable in all instances, to replace a broken or improperly wired circuit breaker in the same position in the panel; nor was it possible for either party to believe with any degree of certainty that the pre-existing panel directories properly described circuits served by the marked individual circuit breakers. The record showed, in fact, that many if not most of the panel directories were either mislabeled or missing completely. Therefore, in order to add or modify circuits in any panel box, plaintiff had to determine what circuits were already served by existing circuit breakers. If circuit breakers had to be moved because they were improperly wired or defective, plaintiff had to identify on the panel directory which circuits were served by circuit breakers.

Defendant took mutually exclusive positions *seriatim* on this issue. First, as we have seen, the ROICC and Mr. Thurman concluded that the tracing and labeling effort was outside of the scope of the contract and, therefore, agreed to allow payment for those panel boxes that plaintiff had completed as of Mr. Thurman's letter of February 7, 1984 which declared the "extra" work not needed.[7] That action firmly implanted plaintiff on the horns of a dilemma. Plaintiff could either cease labeling some circuits and leave itself exposed to lawsuits should personal injury or property damage occur from its work, or non-work, in the panel boxes or, plaintiff could continue to label all circuits with the hope or expectation that defendant would eventually recognize the need for the task and execute an additive equitable adjustment. The contracting officer and new counsel of record appointed by defendant shortly before trial, took a different position, *i.e.*, plaintiff was not entitled to an equitable adjustment because, as a matter of contract interpretation, plaintiff was required to label all the circuits regardless of whether they had been added or modified by plaintiff. The court will address the latter argument because that was the only position defendant put forward at trial.

The issue of accurate panel directories cannot be viewed in a vacuum. To make an accurate directory, the electrician must know exactly which circuit breaker served which circuit. After working in a panel box such as by adding or modifying circuits and moving pre-existing circuit breakers to new positions, the circuits must be labeled. A letter of June 5, 1985 from the ROICC's Commanding Officer, the Commander, Western Division, Naval Facilities Engineering Command, San Bruno, California to the contracting officer stated the problems succinctly.

The fact that the number of circuits was doubled, and the moving of existing breakers to other spaces was required, shows that the existing directory could not be utilized since it would be incorrect and would not meet the safety requirements of the NEC and the state licensing [sic] requirements (General Provisions Clause 12 applies) which the Contractor so strongly raises as justification of payment. Since the Contractor was fully aware of the work required and that this work would result in all existing directories being incorrect and, thus, a violation of the NEC requirement for identification, it had to be aware that new directories would be required and were its responsibility to provide. Also, to not do so would result in a hazardous condition for personnel who might rely on a directory for assurance that a circuit was de-energized. The fact that the specifi-

---

7. In 1985 an Electrical Engineer employed by defendant took issue with the decision of the ROICC. He wrote, "[f]or your information only, however, ROICC San Diego did not have a sound engineering basis for the stop order since the claimed work would have been recognized by this office if ROICC San Diego had checked with us pursuant to Articles 90–4 and 110–22 of NEC."

cations clearly directed that the work comply with the NEC, the changes to the panels themselves, negated any requirement for specific direction to replace the existing directories.

It is clear that the ROICC provided the Contractor with misguided direction in originally accepting the proposal as a change to the contract and further assuming that he had authority to waive a requirement when the waiver could result in a danger to life and limb of personnel. The NEC paragraph (90–4) noted does not allow a local authority, which the ROICC is not [sic],[8] to waive a specific portion of the Codes unless another method of effective safety is provided. This was not the case; and, if an alternative was available the ROICC was required to contact personnel at a higher level of authority prior to waiving this or any other Code requirement whose use is mandatory.

In summation, the providing of new panel directories was the result of the work performed in the panel and requirements of the NEC and Clause 12 of the General Provisions. Based on these facts, the Contractor's claim has no merit.

Accordingly, it is recommended the claim be denied in its entirety.

The contracting officer agreed with plaintiff that accurate panel directories were required by the NEC, and that any experienced electrician would know "that altering panel directories to reflect new circuits that were provided or any existing circuits which were relocated or modified was an essential part of the contract...." Final Decision of the Contracting Officer (Feb. 5, 1986). Bearing in mind that wiring problems were found in all 445 panel boxes, that plaintiff added or modified one-third to one-half of all circuits in each box, that the relatively few existing circuit breakers that did work were oftentimes rearranged within the boxes, that "doubled-up" circuits

were properly split into two breakers (at least one of which was new even though the circuit was not new or modified), and that many panels lacked any kind of directory at all, it was not unreasonable to conclude, in order to comply with the NEC and state code, that new directories were a contract requirement. Moreover, the record is clear that plaintiff made new directories for all of the panel boxes because pre-existing directories either did not exist or could not be corrected accurately by merely identifying the new or modified circuits.

Defendant further argued at trial that inasmuch as the contract, through the NEC, required accurate panel labels and if the only way to accomplish that task was to trace every circuit, including those that Lo–West did not add or modify, then plaintiff knew or should have known of that task and included costs therefor in its original bid. Moreover, defendant continued, any term or document incorporated by reference into a contract, such as the NEC here, has the same full force and effect as if expressly written into the contract. *See* General Provision 78 of the contract, "SPECIFICATIONS AND STANDARDS." To this, the court notes that in so arguing at trial defendant recognized the impropriety and invalidity of Mr. Thurman's directive of February 7, 1984 that the labeling effort was not necessary. That may well have been of no import however because plaintiff ignored Mr. Thurman's February 7th directive during performance of the contract.

Given that proper directories are a NEC requirement, and the contract requires compliance with the NEC, the work for which plaintiff submitted a claim was within the scope of the contract. *See, e.g., Hol-gar Mfg. Corp. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384 (1965) (read contract so as to give meaning to all its terms; no contract term is meaningless) (citations omitted); *W.M. Schlosser Co. v. United*

---

**8.** This sentence indicated that the ROICC was "not" a local authority and implied that he therefore could issue a waiver to the NEC. The court believes this not to be the case and that the word "not" is a typographical error. To

read that phrase in harmony with the rest of the document, it must be assumed that the author intended to say that the NEC "does not allow a local authority, which the ROICC is, to waive a specific portion of the Codes...."

*States,* 767 F.2d 870, 874 (Fed.Cir.1985) (a contract interpretation is unreasonable if it "would render [the] contract language superfluous"); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed. Cir.1983). If the only way to properly label circuits was for Lo–West to perform the tasks Messrs. Blum and Rudin described above, then that is what plaintiff was contractually obligated to do.

Defendant had the right to modify the terms of the contract pursuant to the changes clause, Clause three of the General Provisions, by either adding or deleting work from the contract. The court must disagree with plaintiff that Mr. Thurman's letter of February 7, 1984 did not constitute an order to stop what was then considered to be "extra" work. Granted, no words of federal contract art were uttered by Mr. Thurman, however, his action in returning plaintiff's electrical cost proposal for the "extra" effort with a statement that the work was not necessary can only be interpreted as an order to plaintiff to cease labeling pre-existing, not-modified circuits. In short, Mr. Thurman attempted to improperly but unwittingly change the terms of the contract by directing that plaintiff cease labeling all circuits, a contract requirement. It is, however, the opinion of the court that the unintentional amendment to the contract would have been of no merit because it would have contradicted paragraph 90–4 of the NEC which prohibited Mr. Thurman and the ROICC from changing NEC procedures unless "equivalent objectives [would] be achieved by establishing and maintaining effective safety." *See Federal Crop Ins. v. Merril,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Alexandria v. United States,* 737 F.2d 1022, 1027 (Fed.Cir.1984); *see generally Hol-gar Mfg.,* 351 F.2d at 979 (contract is to be interpreted so as to give purpose and meaning to all terms) (citations omitted); *W.M. Schlosser,* 767 F.2d at 874 (contract interpretation must not render any contract language superfluous); *Johnson Controls,* 713 F.2d at 1555 (the court must give meaning to each part of a

contract and interpret the contract as a whole). It is evident that under the facts of this case, to have ceased labeling the pre-existing circuits would not have achieved "equivalent objectives … by establishing … effective safety." NEC at para. 90–4. Mr. Thurman and the ROICC, therefore, had no authority to waive the contract labeling requirement because they did not and could not direct an alternative plan that would provide an equal degree of safety.[9] *Federal Crop Ins.,* 332 U.S. at 384, 68 S.Ct. at 3; *Alexandria,* 737 F.2d at 1027; *see Ball State Univ. v. United States,* 488 F.2d 1014, 1016, 203 Ct.Cl. 291 (1973); *Hol-gar Mfg.,* 351 F.2d at 979; *W.M. Schlosser,* 767 F.2d at 874; *Johnson Controls,* 713 F.2d at 1555. Accordingly, Mr. Thurman's inadvertent attempt to amend the contract would not have been effective in any event, but not for the reasons given by plaintiff. By continuing to label the panels in spite of Mr. Thurman's improvident directive that the task was not needed, plaintiff stumbled into compliance with its already existing duty under the contract.

The court is not unsympathetic to the plight plaintiff found itself in when faced with conflicting directions as magnified by its possible exposure to liability by the Permits and Responsibilities clause, *supra.* No evidence was offered as to whether any method other than the one used by Lo–West could have succeeded under the circumstances. Lo–West chose to trace and identify each circuit in all 445 panels at a great expense of time and money. However, the court is compelled by the clear provisions of the contract to find that the proper labeling of circuits was an unquestioned duty of plaintiff. *See generally W.M. Schlosser,* 767 F.2d 870. How plaintiff chose to comply with that duty was plaintiff's own decision. Plaintiff knew, or should have known, prior to executing the contract, that proper labeling was a contract requirement.

## CONCLUSION

After personally observing the witnesses, hearing argument of counsel, and

**9.** The Commander from the Western Division likewise agreed in his letter of June 5, 1985.

studying the entire record, and in light of relevant contractual provisions, especially paragraphs 90–4 and 110–22 of the NEC, it is the opinion of the court that plaintiff was contractually bound to provide properly labeled panel directories of all of the circuits in all of the electric panels, not just the circuits it specifically added or modified. Therefore, plaintiff is not entitled to an equitable adjustment for performance of that duty. The court recognizes that much confusion existed at the time of performance caused primarily by defendant's inappropriate formal and informal directives. Such confusion, however, does not alter the fact that plaintiff owed defendant a contractual duty which it performed. The fact that nearly one thousand man-hours were spent by Lo–West in identifying circuits so that they could be properly labeled cannot be considered a change under the contract because the method of compliance was plaintiff's own decision.

The Clerk of the court is directed enter judgment dismissing the complaint accordingly. No costs.