**FRY COMMUNICATIONS, INC.—Info-conversion Joint Venture, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 174–89C.

United States Claims Court.

Feb. 5, 1991.

Michael A. Dornbaum, Commack, N.Y., for plaintiff.

Hillary A. Stern, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge.

### Introduction

This case requires the court to decide—whether the Government Printing Office Board of Contract Appeals (GPOBCA) erred in upholding the contracting officer's disallowance of certain claim charges by plaintiff pursuant to a contract to revise United States Army manuals. It is the liability issue which is before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, we hold—(i) that the GPOBCA committed legal error in interpreting the contractual definition of the word "transaction"; and (ii) that the court will stay a ruling on the parties' cross-motions for summary judgment pending a remand to the Board of Contract Appeals for certain findings of fact.

### Facts[1]

On May 4, 1983, the Government Printing Office (GPO) instituted formal two-step advertising for bids with respect to Purchase Order 33846, Jacket 421–710, otherwise known as GPO program 400–S (878–85–067). The objective of the program was to create and maintain a system for the electronic storage and revision of United States Army manuals. In step one of the process, offerors were requested to provide technical proposals without pricing. In step two, offerors with acceptable technical proposals submitted price quotations for the various tasks outlined in the Invitation for Bids (IFB), which was drafted by the GPO. Plaintiff, a joint venture consisting of Fry Communications, Inc. and Infoconversion (hereinafter Fry or plaintiff), submitted a satisfactory technical proposal and received an IFB.

The IFB set forth a number of required contractor functions and modifications, including but not limited to—(i) data capture, which involves keying current Army manuals into an electronic data base; (ii) digitizing art work and other illustrations to permit them to be read by the computer; (iii) photo composition, a computer process by which the computer composes the page in accordance with Army specifications; (iv) revision of the text, referred to as "updating and editing;" and (v) traditional printing.

The dispute at bar concerns the interpretation of the contractual term "transaction." This is so because a "transaction" is an activity warranting a contractual charge by plaintiff. More importantly, its definition is determinative as to whether an activity by plaintiff entitles it to one or two monetary transaction charges. Relevant portions of the GPO-drafted IFB provided as follows:

DEFINITIONS:

Character: A letter, number, graphic symbol, punctuation mark, or word space.

\*　　\*　　\*　　\*　　\*　　\*

Updating and Editing: Any deviation from the original copy made at the direction of the ordering agency after initial keyboarding [entry into the database], and may consist of:

(1) Change or Addition—A single move or addition of word(s). May be a code, a word, a phrase, a sentence, a paragraph, or a block of continuous reading matter inserted at one place.

(2) Deletion—An elimination at a single place.

\*　　\*　　\*　　\*　　\*　　\*

Global Search Alteration: Altering a specific letter group (word or words), figure group or code throughout a database via the use of machine generated data manipulation capabilities.

\*　　\*　　\*　　\*　　\*　　\*

---

1. The court relies on the administrative record before the GPOBCA and, in addition, adopts the parties' Stipulation of Facts for the factual background.

Transaction: The act of making an update or edit in the data base. It includes searching the data base for the location of the alteration and the movement or deletion of existing data.

\*　　\*　　\*　　\*　　\*　　\*

Measurement of and Payment for Updating and/or Editing:

\*　　\*　　\*　　\*　　\*　　\*

(2) The charge for deleting or transposing type lines without setting and inserting new material will be one "per transaction" charge for each group, regardless of the number of lines in a group. Proofs of any deleted matter must be submitted with the voucher to obtain payment.

\*　　\*　　\*　　\*　　\*　　\*

SCHEDULE OF PRICES

\*　\*　\*

9. Updating and/or editing:
(a) Flat charge for making a deletion, a change, or an addition.... per transaction ....................... $_____

(b) Adding characters to file from manuscript, reprint copy, or proofs:
(1) Text ... per 1,000 characters .................... $_____
(2) Tabular ... per 1,000 characters ................. $_____

\*　\*　\*

In submitting bids under step two, Fry and three other offerors proffered unit prices on over 100 line items. The IFB provided estimates on the anticipated number of units per year[2] for each line-item category. Under the general heading of— "Updating/editing" were line items, *inter alia*, for "Flat charge/trans[action]," for which Fry bid $3.06, and for "Adding [text] characters to the file," for which Fry bid $4.59 per 1,000 characters. There is nothing in the record to indicate, and it is not alleged therein, that Fry sought clarification from the GPO prior to bidding in January 1984,[3] as to the meaning of the term "transaction." Fry was the lowest responsive, responsible bidder, and was awarded the contract on February 9, 1984.[4]

After performing the initial data capture function of the contract, Fry began the updating and editing process. When Fry submitted payment vouchers to the GPO for performing the updating and editing, it claimed *two* transaction charges wherever a *deletion* of existing material and the *addition* of new material were made at the *same location* in the text. The contracting officer rejected the invoices, informing Fry that the search and deletion portion of the operation was chargeable as one transaction, and that the addition of new material without a second search should be charged as adding characters to the file, not as a second transaction. In view thereof, Fry appealed the contracting officer's decision to the GPOBCA.

In a decision dated July 29, 1986, GPOBCA No. 9–85, the GPOBCA granted the government's motion for summary judgment, ruling that Fry was entitled to only one "per transaction" charge "when in nearly simultaneous sequence it must make both a deletion and an addition to the data base at precisely the same physical point in the data base file." The GPOBCA's decision was explicitly based on its construction

2. The IFB contemplated a five-year contract term, assuming the availability of funds.

3. The record does not reveal the precise date when Fry submitted its bid. However, the IFB was sent to offerors on January 9, 1984, and the contract was awarded on February 9, 1984.

4. The three other bids for the "per transaction" line-item were not close to Fry's bid of $3.06. For this same line-item, they were $9.92, $0.50, and $0.50.

of the IFB. After reviewing the contract provisions set forth above, *inter alia,* the GPOBCA concluded that the word "change," under the "Updating and Editing" portion of the definition of a "transaction," was used in its ordinary sense. Relying on selected definitions from the Random House Unabridged Dictionary, the GPOBCA held that the word "change" had "subsumed in its meaning the concomitant correlative concept of 'deletion' as a necessary process to its accomplishment," and, therefore, a revision consisting of a deletion and an addition at one place was just one "change," hence, one "transaction," and hence, only one charge.

The GPOBCA's adverse decision was appealed by Fry to this court, invoking jurisdiction under 28 U.S.C. § 1491(a)(1),[5] and review pursuant to the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322.[6] The parties agree on all of the material facts, and, consequently, have filed cross-motions for summary judgment.

### Positions of the Parties

#### Plaintiff

The fundamental position of plaintiff is that—the decision of the GPOBCA, interpreting and construing the contractual definition of the term "transaction," is erroneous as a matter of law and should be reversed by this court. Given the foregoing, the parties have stipulated that the broad dispositive issue is—

> Whether the Government Printing Office Board of Contract Appeals ... properly interpreted certain language contained in a contract between plaintiff and defen-

dant known as Purchase Order 33846, Jacket 421–710 or GPO Program 400–S (878–85–067) ...?

In its motion for summary judgment, plaintiff further refined its position by averring three basic contentions—

(i) the Board erred as a matter of law when it refused to apply definitional terms contained in the contract;

(ii) said contractual language is clear and unambiguous and must be applied; and

(iii) alternatively, while assuming said definitional language to be ambiguous, it is susceptible to more than one reasonable interpretation, thus latent, and the doctrine of *contra proferentem* must be applied.

First, Fry argues in explicating its position that under the clear and unambiguous language of the IFB, it is entitled to a transaction charge when—a deletion is made, and a second transaction charge when an addition is simultaneously made at the same location. Specifically, Fry relies on the broad contractual definition of the word "transaction" as being "any deviation" from the text, as well as on the more specific definition of "update or edit," which explicitly includes an "addition" and a "deletion" as acts constituting separate transactions.

Fry takes issue with the GPOBCA's interpretation of a chargeable "transaction." For example, "change or addition" are singularly contractually defined as a "single move or addition" of words, while "deletion" is defined as an elimination. Notwithstanding the explicit contractual definition of the word "change," *supra,* the GPOBCA held that the word "change"

---

5. 28 U.S.C. § 1491(a)(1) provides in relevant part:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States....

6. The Wunderlich Act, 41 U.S.C. §§ 321, 322, provides:

> § 321. No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such

contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

> § 322. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

"was used in its ordinary sense and not in fact defined itself in the contract," thus, its meaning, says the Board, comports with the dictionary definition—"replace with another." The court is urged, therefore, to reject the GPOBCA's interpretation of the term "transaction" inasmuch as it ignores the understanding of the parties that it shall have a special meaning.

Alternatively, Fry argues that even assuming that the IFB was ambiguous, it was latently so and the interpretation it advances is reasonable under the circumstances. This is so, argues plaintiff, because even after a search, it must perform *two* separate operations when it *deletes* and *adds* material, even at the same location. Finally, Fry avers that when it arrived at its bid of $3.06 per transaction charge, it relied on the aforementioned interpretation of the term "transaction," and designed a system which would count a "transaction" for billing purposes every time material was either *deleted* or *added.* Because any ambiguity was latent, and not patent, says plaintiff, and since its interpretation of the GPO's drafted IFB was reasonable, upon which it relied, the court should apply the doctrine of *contra proferentem.*

### Defendant

While defendant argues that the IFB was clear and unambiguous, it contends that Fry's interpretation of the contract provisions as to what acts constitute a properly chargeable "transaction" is incorrect. To support its interpretation of the IFB, defendant relies on its reading of a portion of the contractual definition of "transaction"—as "includ[ing] searching the data base for the location of the alteration and the movement or deletion of existing data." According to defendant, the essence of a chargeable "transaction" is a revision of the data base, *i.e.,* a "change," performed in conjunction with a required *search* of the text. Since a "change" is literally a replacement with another, in the

contractual context the parties meant that where an "addition" is at the *same location* as a "deletion," a second search is not required, thus a second transaction charge cannot be justified for such an addition. In such circumstances, the addition of new material at the same location as a deletion should be charged, not as an additional "transaction," but rather, as "adding characters to the file."

The government contends, therefore, that Fry's interpretation of the IFB is unreasonable, because it renders the provision for "adding characters to the file" meaningless. Further, the government argues that the actual computer process for indicating deletion of old material and addition of new material is irrelevant to the meaning of the IFB. Finally, the government argues that to the extent that the contract defines a "transaction" as the "act of making an update or edit," and an update and edit is further defined as a "change," the GPOBCA nevertheless correctly held that in truth the word "change" was not defined in the IFB, but rather was meant in its ordinary sense.

### Scope of the Court's Opinion

Against the foregoing background, the issues postured herein require this court to decide—whether the IFB, as drafted by the GPO, was ambiguous. If so, was the ambiguity patent or latent, and if the latter, did Fry actually and reasonably interpret and rely on the IFB to allow *two* transaction charges for a search of the text, deletion of existing material, and the insertion of new material at the same location?

### Discussion

I. Jurisdiction and Standard of Review[7]

■ Fry's contract with the GPO is not subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. This is so because the CDA applies to contracts entered into by *executive* agencies, 41 U.S.C. § 602(a), whereas here the GPO is not such, but rather is an agency of Congress.

---

7. The court is obliged to inquire whether it has jurisdiction, even where the parties are silent on the issue. *Hambsch v. United States,* 857 F.2d 763, 765 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989).

*Tatelbaum v. United States,* 749 F.2d 729 (Fed.Cir.1984) *(relying on International Graphics v. United States,* 4 Cl.Ct. 186, 197 (1983)). Nevertheless, the Claims Court has jurisdiction over this case, inasmuch as plaintiff seeks money damages for breach of an express contract with the United States, under the Tucker Act, 28 U.S.C. § 1491(a)(1).[8] This court will, therefore, review the GPOBCA's decision under Wunderlich Act standards, 41 U.S.C. §§ 321, 322.[9]

■ In a Wunderlich Act case, the court sits, in effect, as an appellate tribunal, limiting its review to the record developed before the agency. In such cases, the parties frame the operative issues through motions for summary judgment. *Titan Pacific Constr. Corp. v. United States,* 17 Cl.Ct. 630, 632 (1989), *aff'd mem.,* 899 F.2d 1227 (Fed.Cir.1990). Here, the GPOBCA made no findings of fact, inasmuch as the dispositive issue here is one of contract interpretation. In such circumstance, the GPOBCA's conclusions of law are not binding on this court, and the court is free to resolve questions of contract interpretation *de novo. HRH Constr. Co. v. United States,* 192 Ct.Cl. 912 (1970); 41 U.S.C. § 322. In this circuit, contract interpretation is clearly a question of law and, as here, may be appropriately resolved by a decision on summary judgment. *P.J. Maffei Building Wrecking Co. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984).

## II. Applicable Law

We observe at the threshold that "[i]n construing a contract, the language of the instrument is given its ordinary and commonly accepted meaning *unless it is shown that the parties intended otherwise." Hol–Gar Mfg. Corp. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384, 390 (1965) (emphasis added). "An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). In inter-

preting contract terms, "the context and intention [of the parties] are more meaningful than the dictionary definition." *Rice v. United States,* 428 F.2d 1311, 192 Ct.Cl. 903, 908 (1970).

Contractual language is ambiguous if it is "susceptible of two different interpretations, each of which is found to be consistent with the contract's language." *Sun Shipbuilding & Drydock Co. v. United States,* 393 F.2d 807, 183 Ct.Cl. 358, 372 (1968) (citation omitted). Differing reasonable interpretations, without more, "are sufficient to convince [a court] that there was ... a latent ambiguity." *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir.1986). In the case of a latent ambiguity, *contra proferentem, infra,* applies "subject to the condition that the alternative interpretation tendered [by the non-drafting party] is reasonable." *William F. Klingensmith, Inc. v. United States,* 505 F.2d 1257, 205 Ct.Cl. 651, 657 (1974). The doctrine of *contra proferentem* properly "puts the risk of [latent] ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms[,] and it saves contractors from hidden traps not of their own making." *Sturm v. United States,* 421 F.2d 723, 190 Ct.Cl. 691, 697 (1970). Additionally, "where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid." *Fruin–Colnon Corp. v. United States,* 912 F.2d 1426, 1430 (Fed.Cir.1990) (quoting *Lear Siegler Management Services v. United States,* 867 F.2d 600, 603 (Fed.Cir.1989)). Finally, general contract law also provides that in construing ambiguous contracts "the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises." *Edward R. Marden Corp.,* 803 F.2d at 705.

■ On the other hand, if an IFB is *patently* ambiguous, "the contractor has a

---

**8.** *See supra* note 5.

**9.** *See supra* note 6.

duty to inquire of the contracting officer the true meaning of the contract before submitting a bid." *Newsom v. United States,* 676 F.2d 647, 230 Ct.Cl. 301, 303 (1982) (footnote omitted). We view this as an affirmative duty. It is also settled in this court that an ambiguity is patent when there is "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 163 Ct.Cl. 1, 6 (1963). What constitutes a patent ambiguity "cannot be defined generally, but [must be determined] on an *ad hoc* basis [by] looking to what a reasonable man would find to be patent and glaring." *Max Drill, Inc. v. United States,* 427 F.2d 1233, 192 Ct.Cl. 608, 626 (1970) (citation omitted). In short, the patent ambiguity doctrine is aimed at avoiding costly post-award litigation, *S.O.G. of Arkansas v. United States,* 546 F.2d 367, 212 Ct.Cl. 125 (1976), as well as protecting the integrity of the bidding process by ensuring that all offerors bid on the same specifications. *Newsom,* 676 F.2d 647, 230 Ct.Cl. at 303.

■ We find the Court of Claims' explication of the ambiguity doctrine particularly apt:

Both plaintiff's and defendant's interpretations [of the contract] lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed.... This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in

provisions ..., *he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation.* The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility.

*WPC Enterprises v. United States,* 323 F.2d 874, 163 Ct.Cl. 1, 6 (1963) (citations omitted; emphasis added).

### III. Analysis

The parties agree on all of the material facts, and have filed cross-motions for summary judgment. As previously noted, the substantive question presented is one of contract interpretation, a pure question of law. We begin our analysis with the observation that there are several questions which we must address, and they are—

(i) Was the GPOBCA's decision correct as a matter of law?

(ii) If not, was there an ambiguity in the IFB?

(iii) Was each party's interpretation of the IFB within the zone of reasonableness?

(iv) If there was an ambiguity, was it patent, *i.e.,* did it contain obvious errors, gross discrepancies, or glaring gaps?

(v) If the ambiguity was not patent but was latent, did plaintiff rely on its interpretation in preparing its bid?

Said issues will be addressed seriatim. For the reasons set forth below, the GPOBCA's decision is reversed.

### A. The decision below

■ While the conclusions of law rendered by an agency board of contract appeals are not binding on this court, 41 U.S.C. § 322, an agency's interpretation of a contract is nevertheless entitled to careful consideration and should be accorded some deference. *Raytheon Co. v. United States,* 2 Cl.Ct. 763, 767 (1983), *aff'd,* 730 F.2d 1470 (Fed.Cir.1984). For several rea-

sons, however, the court must, after reflection, reject the GPOBCA's interpretation of the IFB.

■ First, and as previously noted, contractual terms are to be given their plain and ordinary meaning *unless* it is shown that the parties intended otherwise. *Hol–Gar Mfg.*, 351 F.2d 972, 169 Ct.Cl. at 390. Put another way, context and intent of the parties are more important than bland dictionary definitions. *Rice*, 428 F.2d 1311, 192 Ct.Cl. at 908.

■ It is indisputable that the GPO in its effort to contractually define the term "transaction" intended to depart from the ordinary and general meaning of the word inasmuch as it defined it as an "update and edit," which was further defined as a "change or addition" and "deletion," which were further defined as a single move or addition and an elimination, respectively. By applying a dictionary definition to the word "change," and by disregarding the plain contractual meaning thereof, when it is evident beyond cavil that the parties intended it to have a special meaning, is clear error by the Board. Context and intent of the parties is paramount in interpreting the contractual term "transaction," thus, we hold that to arbitrarily disregard contractual definitions in favor of dictionary meanings in a highly technical contract, as here, is fundamental error.

Second, even if we were to agree with the GPOBCA's conclusion that the term "change" was *not* defined in the IFB, but was merely employed to help define other contractual terms, the court could not countenance the GPOBCA's disingenuous use of the dictionary. It is patently obvious that the GPOBCA attached only those dictionary definitions of the word "change" which were compatible with its objective and ignored those definitions which failed to explicate the interpretation that the GPOBCA preferred. Indeed, the essence of the very first dictionary definition cited by the GPOBCA is simply "to make ... different." That definition clearly does not suggest that "change" only connotes "replacement" or "substitution." To define a "change" in the dictionary sense of "to make ... different" would obviously contemplate a mere "deletion" of a portion of the data base. Other definitions of "change" given short-shrift (or no consideration at all) by the GPOBCA include "vary," "alter," "amend," "modify" and "deviate." None of these definitions suggest that "change" is synonymous with "substitute" or "replace." Only by *selectively* citing hospitable definitions and synonyms could the GPOBCA conclude that "change" really means the same thing as "substitute" or "replace with another," which from the GPOBCA's perception encompasses *both* a "deletion" and an "addition."

Third, the GPOBCA's conclusion that the word "change" was used in its ordinary sense raises more questions than it answers. For example, if the IFB used the term "change" in its ordinary sense, it is puzzling that the GPO went to the trouble of contractually defining "addition" and "deletion," since addition of new material and elimination of existing material are changes *in the ordinary sense.*

Accordingly, the GPOBCA's decision must be set aside as clear legal error.

## B. Whether the IFB was ambiguous

Contractual language is ambiguous if it will sustain different reasonable interpretations. *Edward R. Marden Corp.*, 803 F.2d at 705; *Sun Shipbuilding*, 393 F.2d 807, 183 Ct.Cl. at 372. The dispute at bar stems from the proper interpretation of the contractual definition of the word "transaction." That definition, of course, is critical to defendant's monetary obligation because the contract provides that plaintiff may charge the GPO for each "transaction." For the reasons set forth below, the court concludes that the IFB is ambiguous, as both the government and Fry advance different reasonable interpretations.

■ It is important to keep in mind, at the outset, the framework in which the ambiguity analysis must take place. The government cannot prevail simply by showing that its interpretation of the IFB is somehow "better" than Fry's interpreta-

tion; the crucial issue in this connection is whether *Fry's* interpretation is *within the zone of reasonableness*. *See WPC Enterprises*, 323 F.2d 874, 163 Ct.Cl. at 6. An additional imperative is—whether the parties advance different reasonable interpretations simultaneously, for if there is *only one* reasonable interpretation, it follows that the IFB is unambiguous. Further, if the IFB was unambiguous, there would be no need to inquire whether Fry relied on its interpretation when preparing its bid. With this framework in mind, the court will proceed to analyze the reasonableness of the respective interpretations advanced by the parties. Only if both interpretations are reasonable will the court be required to address whether the ambiguity was patent, and whether Fry actually relied on its interpretation in preparing its bid.

### 1. Defendant's interpretation

■ Defendant initially contends that the IFB is clear and unambiguous, and that there is, therefore, only one reasonable interpretation. Defendant interprets the IFB as follows: a deletion and an addition made at the same location entitles the contractor to just one transaction charge (for the search and deletion), and the addition of material at the same location, without a second search, must be charged as adding characters to the file. To support its interpretation, defendant relies on only the portion of the IFB's definition of a "transaction" as "includ[ing] searching the data base for the location of the alteration and the movement or deletion of existing data." Based on this provision, defendant argues that the essence of a transaction is an alteration *performed after a search of the text*. Since a deletion and an addition at the same location requires just *one search*, such an operation is only one transaction. Consequently, the government contends that the effect of adding material at *the* location of a deletion should only entitle plaintiff to a charge for "adding characters to the file" and not a charge for a second transaction.

In this context, defendant maintains that—a search followed by a deletion at a location in the data base fits the contractual definition of a chargeable "transaction." It further maintains that it is improper to charge a second "transaction" where there is but *one* search preceding a deletion and an addition at the same location. Stated differently, to be entitled to two transaction charges, defendant's position is that where there is a deletion and an addition to the data base, there must be a *separate* search and a *separate* location for each activity.

Given the foregoing, the court cannot say that the government's interpretation is outside the "zone of reasonableness." Even though the government relies on only portions of the contractual definitions, the inferences the government draws are rational and consistent with contract language, *Sun Shipbuilding*, 393 F.2d 807, 183 Ct.Cl. at 372, and do not rest on any obvious errors, gross discrepancies, or glaring gaps. *WPC Enterprises*, 323 F.2d 874, 163 Ct.Cl. at 6.

Still, the court is compelled to note that if defendant's explanation of the IFB is what the GPO intended, it was within the power, and undoubtedly the obligation, of the GPO to make the IFB clear to bidders. To this end, the drafters of the IFB could have simply said—"An alteration requiring only one search of the text, where a deletion and an addition is made at the same location, entitles the contractor to one transaction charge." There is no contractual provision which *explicitly* states that an indispensable element of a "transaction" is a search of the text, as defendant implies, and this seems to be precisely the sort of "hidden trap," the risk of which should fall on the drafter. *Sturm*, 421 F.2d 723, 190 Ct.Cl. at 697; *WPC Enterprises*, 323 F.2d 874, 163 Ct.Cl. at 6. Having drafted the IFB, the government is in no position to argue that Fry should have adopted *the* "correct" interpretation; by including a few extra words, the GPO could have made its purported intention crystal clear.

### 2. Fry's interpretation

"Transaction" is defined as "the act of making an update or edit in the data base." Updating and editing are defined as "any

deviation from the original copy...." Examples of such (as noted by the language "and may consist of") are a "change or addition," and a "deletion." Under such a broad definition it is reasonable to conclude that adding material—clearly a "deviation" —is a separate transaction. The same conclusion would obtain with respect to a "deletion." At first blush, then, Fry's interpretation of a "transaction" also appears to be reasonable.

Fry agrees with the government's assertion that a search of the text and a corresponding "deletion," standing alone, is a transaction. It parts company with the defendant when it (plaintiff) argues that a corresponding "addition," without another search, is also a separate transaction. In support of this position, Fry argues that the IFB *does not explicitly say* that a search must precede *each* deviation (*i.e.*, a deletion and an addition) at the same location in order to have multiple transaction charges. Stated differently, the IFB does not say that two transaction charges cannot be made where *one* search precedes a deletion and an addition at the same location. Given the foregoing, argues Fry, it was reasonable to believe that the IFB permitted a charge for a deletion as one transaction, and a charge for an addition as a second transaction, even though the alterations were made in the same location.

Paragraph (2) of the Measurement of and Payment for Updating and/or Editing, IFB at p. 6, lends support to Fry's reading of the IFB. Under paragraph (2), one transaction charge is permitted for "deleting or transposing type lines *without* setting and inserting new material" (emphasis added). By negative inference, it is reasonable to conclude that an additional transaction charge is permitted when new material *is* inserted.

The full definition of "Updating and Editing," which further defines the term "transaction," lends additional support to Fry's interpretation. That definition states that an update or edit is:

Any deviation from the original copy made at the direction of the ordering

agency after initial keyboarding [entry into the database], and may consist of:
(1) Change or Addition—A single move or addition of word(s). May be a code, a word, a phrase, a sentence, a paragraph, or a block of continuous reading matter inserted at one place.
(2) Deletion—An elimination at a single place.

From these apparently multiple definitions, Fry asserts that there are just three fundamental ways to alter the data base. First, existing material can be *moved* from one location to another: this is clearly what is meant by "a single move" or a "change." Second, existing material can be *eliminated:* this is clearly what is meant by "a deletion." Third, new material can be *added:* this is either "an addition" or "adding characters to the file." When the material added consists of words, phrases, sentences, or paragraphs, it is chargeable as an "addition"; when the material added is a "letter, number, graphic symbol, punctuation mark, or word space," it is chargeable as "adding characters to the file." Thus, given the contractual definition of updating and editing, which defines a chargeable "transaction," it is reasonable to interpret the IFB as allowing a transaction charge for an "addition" (following a "deletion") *whenever* words, phrases, sentences, or paragraphs are added to the text, irrespective of whether one or two searches are involved.

Paragraph (9) of the Schedule of Prices, IFB at p. 11, also appears to support Fry's interpretation that there are three kinds of alterations chargeable as transactions. That paragraph provides that for updating and/or editing (a definition of a "transaction") a flat charge for making a deletion, a change, or an addition is computed "per transaction." It would, therefore, be unreasonable to assume (as does the Board) that there is a fourth kind of transaction called a "change," defined as constituting *both an addition and a deletion* at one location, because such an assumption is contrary to the express provisions of the IFB, and it leaves no room in the Schedule of Prices for "a single move." A reason-

able interpretation of the contractual definitions of a "transaction" is that a "change" is "a single move [of existing material]"; an "addition" is "addition [of new material]"; and "deletion" is "elimination [of existing material]."

Such an approach, which accounts for all possible types of alterations in the Schedule of Prices, is reasonable insofar as it comports with two fundamental principles of contract construction: (i) meaning and effect should be given to all parts of a contract, *Fortec Constructors*, 760 F.2d at 1292; and (ii) when there is a clear intention to depart from the ordinary meaning of terms, the contractual definitions govern over ordinary meaning. *Rice*, 428 F.2d 1311, 192 Ct.Cl. at 908; *Hol–Gar Mfg.*, 351 F.2d 972, 169 Ct.Cl. at 390. Eliminating existing material from the text, adding new material to the text, or moving existing material from one location to another, are all certainly "changes" to the text *in the ordinary or literal sense*, but such an interpretation as proffered by the Board renders the contractual definitions of "deletion" and "addition" meaningless, or at least unnecessary. Furthermore, by including a section of definitions of contract terms, the GPO manifested a clear intention to depart from the ordinary meaning of terms in the IFB. Thus, it was reasonable for Fry not to resort to a dictionary (as the GPOBCA did) to help it interpret the IFB.

The government contends that Fry's interpretation is unreasonable, because it renders meaningless the eight line items for adding characters to the file, as well as the IFB's explicit estimate of over 19,000,000 characters to be added to the file annually. After all, argues the government, under Fry's approach, addition of characters to the file is *always* charged as a "transaction" (so long as the characters form words). Fry offers no explanation of how, when it prepared its bid, it interpreted the GPO's estimate of 19,000,000 characters added to the file annually, nor does Fry, after performing the contract, offer any guidance to the court as to what "adding characters to the file" might mean.

Simply put, Fry ignores a key point in the government's argument.

Nevertheless, the court rejects defendant's argument for two reasons. First, the government's argument relies on the unstated premise that a party bidding on a government contract is charged with knowing the principle of contract interpretation, *i.e.*, that an interpretation giving meaning and effect to all portions of an instrument is preferred to an interpretation that leaves any portion meaningless. Of course, the court should interpret contracts with the aforementioned principle in mind, but the operative inquiry here is simply whether the interpretation advanced by Fry—ostensibly staffed by laymen—is reasonable.

Second, and in any event, Fry could reasonably have interpreted the provisions for adding characters to the file at face value and moved on. In other words, Fry reasonably assumed that where the materials added were words, phrases, paragraphs, and the like, it was chargeable as an addition (see definition of "addition" under updating and editing), whereas when characters added were simply numbers, letters, codes, spaces, and graphic symbols, it was chargeable as adding characters.

To reiterate, the question is not whether the interpretation advanced by the government is somehow better than Fry's interpretation, but rather, whether Fry's interpretation was within the zone of reasonableness. In light of the foregoing, we hold that Fry's interpretation of the IFB as allowing two transaction charges when a *deletion* and an *addition* are made at the same location is within the zone of reasonableness. The court has already determined that the government also advances a reasonable interpretation. Therefore, we further hold that the IFB was ambiguous. *Edward R. Marden Corp.*, 803 F.2d at 705 (contract is ambiguous if there are different reasonable interpretations). Under the doctrine of *contra proferentem*, Fry's reasonable interpretation of the GPO-drafted IFB will be adopted, so long as the IFB was not patently ambiguous, *William F. Klingensmith*, 505 F.2d 1257, 205 Ct.Cl. at 657, and provided further that Fry relied

on its interpretation in preparing its bid. *Fruin–Colnon,* 912 F.2d at 1430.[10]

### C. Whether the ambiguity was patent

 The IFB was patently ambiguous if it contained a gross discrepancy, an obvious error in drafting, or a glaring gap. *WPC Enterprises,* 163 Ct.Cl. at 6. Case law is clear that what constitutes a patent ambiguity "cannot be defined generally, but [must be determined] on an *ad hoc* basis of looking to what a reasonable man would find to be patent and glaring." *Max Drill, Inc. v. United States,* 427 F.2d 1233, 192 Ct.Cl. 608, 626 (1970) (citation omitted). Thus, the inquiry into—whether an ambiguity is patent is a search, through the eyes of a reasonable man, for *such* discrepancies, errors, or gaps; if the court finds none, it can only conclude that the ambiguity is *not* patent. On the other hand, if the court concludes that the ambiguity is patent, then its inquiry here is at an end, since the record is clear that Fry failed to seek clarification of the IFB prior to bidding. *Newsom,* 676 F.2d 647, 230 Ct.Cl. at 303.

The court has painstakingly examined the IFB in an effort to find any arguable gross discrepancies, obvious errors, or glaring gaps. We are constrained to conclude that such examination revealed only *minor* discrepancies and esoteric gaps, to the extent that the court had to strain—indeed, contrive—to identify them. We are thoroughly satisfied that none rise to the level of an ambiguity so obvious and glaring that Fry should have noticed and sought clarification. The contractor "is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation." *WPC Enterprises,* 163 Ct.Cl. at 6. We hold, therefore, that the ambiguities herein are not patent, but are latent.

The only arguably patent ambiguity is whether "addition" is included in a "transaction." The contractual definition states

that a transaction "includes searching the data base for the location of the alteration and the movement or deletion of existing data." Generally, if the expression of one thing in a contract is the exclusion of another, *Public Utility Dist. No. 1 of Ferry County v. United States,* 20 Cl.Ct. 696 (1990), then transaction, as defined, *supra,* appears at first blush not to include an addition. However, notwithstanding the foregoing, a transaction is also an "update or edit," which *explicitly* "may consist of" a deletion, change, and/or addition. While a portion (*i.e.,* that part seeking to give an example) of the definition of a "transaction" does not expressly contemplate an addition and under another provision it does, we do not find this circumstance to *ipso facto* render the IFB patently ambiguous. Such a treatment here fails to create, in our opinion, gross discrepancies, obvious errors, or glaring gaps. We so conclude because "when there are two clauses in a contract which are in any respect conflicting, the clause which is specially directed to particular matter ... controls over a clause which is general in its terms, ... although within its general terms the part may be included." *United Pacific Insurance Company v. United States,* 497 F.2d 1402, 204 Ct.Cl. 686, 694 (1974). Here, the definition of transaction, which appears to exclude addition, is cast in general terms. The general definition directs the reader to refer to the more specific examples of "transactions" under the updating and editing definition, and the specific examples there given include deletion, change, and *addition* as "transactions." Therefore, the specific definition, which includes addition, controls.

### D. Whether Fry relied on its interpretation

 Having concluded that Fry advances a reasonable interpretation of the latently ambiguous IFB, there remains the matter of whether Fry relied on its interpretation of the IFB *in preparing its bid.*

---

**10.** Having concluded that both the government and Fry advance reasonable interpretations of the IFB, the court rejects Fry's primary position, namely, that the IFB was clear and unambiguous.

It is well-settled that "where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid." *Fruin–Colnon Corp. v. United States*, 912 F.2d at 1430 (*quoting Lear–Siegler Management Serv. v. United States*, 867 F.2d at 603). This rule is aimed at preventing contractors from recovering additional compensation under a contract based on a mere afterthought, *i.e.*, based on an interpretation of the contract not contemplated by the contractor at the bidding stage. Put another way, the actual-reliance rule forces the contractor to prove that it has *actually been injured* as the result of the government's inclusion of a latently ambiguous provision in the contract. If the contractor did not *actually rely* on its interpretation when formulating its bid, it cannot later claim that it will lose money if its post-bid interpretation is not adopted.

Fry alleges in paragraph (9) of its complaint before this court, as it did in paragraph (7) of its complaint before the GPOBCA, that when its bid was prepared, it believed that it could charge for two transactions following *a* search, when making a deletion and an addition at the same location in the text. Additionally, Fry accompanies its motion for summary judgment with the affidavit of Mr. George Devine, the president of joint venturer Infoconversion, wherein Mr. Devine also attests that when his firm prepared its bid, it then believed that two transactions could be charged when a deletion and an addition were made at the same location. The government has neither admitted nor denied Fry's allegations regarding the reliance issue, nor does the government contest the statements in Mr. Devine's affidavit.

For purposes of the present case, however, Fry must show that *when it prepared its bid*—specifically, when it arrived at its bid of $3.06 per transaction—it believed that it could charge for two transactions whenever a deletion and an addition were made at the same location in the text. There is no testimony in the record on this issue, nor are there any worksheets, notes, or other materials in the record which might shed some light on how Fry arrived at its $3.06 figure. The record developed thus far on the reliance issue consists merely of allegations (which the government neither admits nor denies) and self-serving statements *made after the dispute arose.* See *Edward R. Marden Corp.*, 803 F.2d at 705 (court will look to interpretation given to instrument by parties before a controversy arises). Such allegations and statements on this record are, therefore, not sufficient to enable Fry to carry its burden of proof on the reliance issue.

██ The GPOBCA did not make any factual findings on the reliance issue, and indeed, made no factual findings at all, because it concluded as a matter of law that Fry's interpretation of the IFB was unreasonable, and thus granted the government's motion for summary judgment. However, Fry *explicitly argued* before the GPOBCA that when it prepared its bid, it reasonably and actually interpreted the IFB to allow two transaction charges following a single search when an addition and a deletion were made at the same location. Clearly, then, since Fry raised the reliance issue and was not permitted to adduce evidence thereon at the board of contract appeals, it is entitled to an evidentiary hearing on the reliance issue. This court cannot hold such an evidentiary hearing, because in a Wunderlich Act case, a reviewing court is strictly limited to the factual record developed before the agency, and the reviewing court may not take evidence to supplement the record. *See United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 432, 86 S.Ct. 1539, 1544, 16 L.Ed.2d 662 (1966) (where agency board of contract appeals does not make factual findings, Court of Claims in Wunderlich Act review cannot make its own findings of fact; such a case should be remanded to the board, since the task of resolving factual issues is initially for the board, not the Court of Claims, under standard government contract "disputes" clause); *accord, Titan Pacific*, 17 Cl.Ct. at 632 n. 4.

28 U.S.C. § 1491(a)(2) provides in pertinent part that "[i]n any case within its

jurisdiction, the [Claims Court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." Therefore, pursuant to RUSCC 60.1, this matter is hereby remanded to the GPOBCA, for a period not to exceed six months, for an evidentiary hearing *on the sole factual issue* of—whether Fry actually relied, at the time it prepared its bid, on its present interpretation of the IFB, *supra.* The court has ruled as a matter of law that: (i) the IFB was ambiguous; (ii) the ambiguity was *not* patent but latent; and (iii) under the doctrine of *contra proferentem,* Fry's interpretation will be adopted so long as it establishes that it actually relied on said interpretation when its bid was prepared.

### Conclusion

The decision of the GPOBCA is, therefore, reversed wherein it found that as a matter of law it is appropriate and proper to apply the normal dictionary meaning to the word "change" when it is clear beyond *all doubt* that the parties specifically intended that said word be interpreted as agreed in the contract. Ruling on the parties' cross-motions for summary judgment on the issue of liability is stayed for a period of six months from the date of this opinion, *i.e.,* to and including August 5, 1991. This matter is remanded to the GPOBCA for a fact-finding proceeding consistent with this opinion.

IT IS SO ORDERED.