ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
A.T.I. TACOSE S.C.a R.L. ) ASBCA Nos. 59157, 59200
)
Under Contract No. N33191-11-C-0413 )

APPEARANCE FOR THE APPELLANT: Antonio Marcello Boschetti, Esq.
Studio Legale Avv. Antonio M. Boschetti
San Salvo, Italy

APPEARANCES FOR THE GOVERNMENT: Ronald J. Borro, Esq.
Navy Chief Trial Attorney
David L. Koman, Esq.
Senior Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE NEWSOM
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Appellant, A.T.I. TACOSE S.C.a R.L. (TACOSE), was awarded a contract to
design and build a dormitory for the Navy at Aviano Air Base in Italy. It appeals from
final decisions denying two claims for additional compensation for work that it contends
the government added to its contract. The government contends that the contract as
originally awarded required this work and no additional compensation was warranted.
Our jurisdiction to entertain these appeals arises from the Contract Disputes Act of 1978
(CDA), 41 U.S.C. §§ 7101-7109.

Both appeals involve disputes over the interpretation of requirements in a
design/build contract. For the reasons explained below, we agree with the
government's interpretations. We grant the government's motion for summary
judgment and deny TACOSE's motion for summary judgment with respect to both
appeals.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

The following facts are not in dispute.

1. On 10 February 2011, the Naval Facilities Engineering Command, Europe,
Africa, Southwest Asia, issued a solicitation for a competitive procurement seeking to
award a design/build contract for a dormitory at Aviano Air Base in Aviano, Italy
(R4, tab 7 at 1367). Proposals were due 43 days later on 25 March 2011 (*id.* at 1368).

2. The request for proposals (RFP) did not include a finished design. The RFP included a package setting forth minimum requirements, including specifications and drawings (R4, tab 1 at 143). After award, the selected contractor was required to design and construct the dormitory in accordance with these requirements (R4, tab 40 at 1991). Bidders were encouraged to develop unique solutions that exceeded the minimum requirements, provided that the design satisfied applicable building codes (R4, tab 1 at 143).

3. Because both appeals turn on the interpretation of the minimum requirements, we describe those requirements in some detail. The RFP and later the contract set forth requirements in six Parts, as follows:

> Part 1 – Proposal Forms and Documents
> Part 2 – General Requirements
> Part 3 – Project Program
> Part 4 – Performance Technical Specifications
> Part 5 – Prescriptive Technical Specifications
> Part 6 – Attachments, including project drawings

(R4, tab 1 at 2, 688)

4. The contract required that the dormitory "be designed and constructed according to the latest version of all applicable design guides...US Government Standards and Italian Laws and Norms." It expressly identified certain Italian, European and other building codes applicable to the dormitory design and construction. (R4, tab 1 at 143) It also incorporated by reference other building codes, laws, and other building standards (*e.g.*, R4, tab 1 at 47-48, 369). Most contract Parts listed multiple codes and standards that were incorporated by reference (*e.g.*, R4, tab 1 at 47, 143, 222, 369, 480, 711).

5. The contract required compliance with applicable building codes even if those codes were not expressly listed in the contract, stating "All applicable norms and standards, including those incorporated by reference, shall be met, whether or not a specific Italian or European norm or standard is indicated for a product or installation" (R4, tab 1 at 479-80, 489-500).

6. Among the publications incorporated by reference were certain U.S. Department of Defense (DoD) Unified Facilities Criteria (UFC) (R4, tab 1 at 47, 370). The UFC comprise a system of criteria for the planning, design, construction, sustainment, restoration, and modernization of DoD facilities (R4, tab 5 at 1236). Each UFC covers a different discipline or subsystem, *e.g.*, electrical engineering, fire protection engineering, interior design, and design procedures, among others (R4, tab 1 at 47).

2

7. On 28 July 2011, the government awarded Contract No. N33191-11-C-0413 (contract) to TACOSE for a firm-fixed-price of €9,860,000 (R4, tab 14 at 1411-14).

8. After award, TACOSE was required to prepare designs of increasing maturity for government review and approval, including a Design Development submittal of 50-60% completion; a Prefinal Design of 100% completion; and a Final Design (R4, tab 1 at 72). TACOSE was also required to designate a Designer of Record (DOR) who had overall responsibility for the design (R4, tab 1 at 27, 49-50). TACOSE designated the OK Design Group of Rome, Italy (OK Design) as its DOR. OK Design was a subcontractor to TACOSE. (Tr. 15-17, 27; R4, tab 32 at 1560)

9. During performance, disagreements over the requirements arose between the government and TACOSE, some of which are the subject of these appeals. In ASBCA No. 59157, TACOSE contends that the government directed it to install 144 more mass notification speakers than the contract required. In ASBCA No. 59200, TACOSE contends that the government constructively changed the contract to add requirements for a perimeter waterproofing membrane and insulation for the ground floor slab. (R4, tabs 19, 34)

Mass Notification System Speaker Dispute

10. In Part 3 of the contract, entitled Project Program, Paragraph D4010 governed the dormitory's Life Safety Notification Systems. It required that the contractor "[p]rovide a complete, electrically supervised mass notification system (MNS) with paging function throughout the facility." (R4, tab 1 at 201)

11. The purpose of an MNS is to "protect life by indicating the existence of an emergency situation and instructing people of the necessary and appropriate response and action." In an emergency, the MNS provides "real-time information and instructions" to people in the building, using voice communications along with visible signals, text, graphics, or other methods of communication. (R4, tab 5 at 1243)

12. Paragraph D4010 specified further that the MNS was to include, in finished spaces, flush-mounted speakers to provide audible notifications (R4, tab 1 at 201). The dispute in this appeal concerns the number and placement of these speakers.

13. The contract called for 144 sleeping rooms arranged in 36 groupings, each consisting of 4 bedrooms and a common area. Each grouping was known as a "Quad Module." (R4, tab 14 at 1411) TACOSE contends that the contract required it to install one MNS speaker in each Quad Module, to be installed in the common room (app. br. at 11). The government contends the contract required TACOSE to install at least four speakers in each Quad Module, one in each sleeping room (gov't br. at 16-17).

3

14. Various contractual elements bear upon the location of MNS speakers. The contract required compliance with UFC 3-600-10N, entitled "Fire Protection Requirements" (R4, tab 1 at 370, tab 6 at 1331). This requirement appears in many sections, including Part 2 General Requirements; Part 4 Performance Technical Specifications; and Part 6 Attachments, Project Description, and Life Safety Analysis (*e.g.*, R4, tab 1 at 48, 62 (Part 2), at 370-71, 376-77, 482, 487 (Part 4), at 711, 720 (Part 6)).

15. In particular, Part 4 Performance Technical Specifications, paragraph D401001, subparagraph 1.3.2.1, described the requirements for MNS notification features and expressly required compliance with UFC 3-600-10N, directing: "Provide audible notification throughout the facility meeting the requirements of UNI EN 54, UFC 3-600-01, and UFC 3-600-10N" (R4, tab 1 at 376). In addition, paragraph Z10, paragraph 1.8.3, entitled "FIRE PROTECTION" directed:

> Design and construct the facility in compliance with Italian Laws and standards and US Government standards relating to fire protection and life safety. This includes but is not limited to UFC 1-200-01, "General Building Requirements", UFC 3-600-01, "Design: Fire Protection Engineering for Facilities", *and UFC 3-600-10N "Fire Protection Engineering"*.

(R4, tab 1 at 487) (Emphasis added)

16. The contract specified that the version of UFC 3-600-10N applicable to this contract was the "26 Final Draft August 2007" (R4, tab 1 at 711, 720).

17. Section 2-4 of UFC 3-600-10N addressed "FIRE ALARM, DETECTION, MASS NOTIFICATION, AND CONTROL SYSTEMS" (R4, tab 6 at 1341). Subsection 2-4.7 therein set forth design criteria for notification appliances. Significantly, it expressly required audible notification appliances *in each sleeping room*, stating:

> 2-4.7.3    In addition to devices required by Code, *provide audible notification appliances in each sleeping room regardless of occupancy classification.* The provision of a room smoke detector sounder base does not negate the requirement of the audible notification appliances for each sleeping room.

(R4, tab 6 at 1344) (Emphasis added)

4

18. Part 6 of the contract included drawings (R4, tab 1 at 2, 688), at least two of which depicted MNS speakers. Drawing FA-101, entitled "FIRE ALARM," displayed a fire alarm diagram that showed a quad common room that included an MNS speaker and showed sleeping rooms without MNS speakers (R4, tab 1 at 822). Drawing FA-601, entitled "RISER DIAGRAM – FIRE ALARM/MASS NOTIFICATION" showed speakers but did not show any rooms (R4, tab 1 at 823).

19. The contract included various clauses to resolve discrepancies between the specifications and drawings. First, it incorporated Naval Facilities Acquisition Supplement (NFAS) clause 5252.236-9312, DESIGN-BUILD CONTRACT – ORDER OF PRECEDENCE (AUG 2006), which provides:

> (A) In the event of conflict or inconsistency between any of the below described portions of the conformed contract, precedence shall be given in the following order:
>
> (1) Any portions of the proposal or final design that exceed the requirements of the solicitation.
> (a) Any portion of the proposal that exceeds the final design.
> (b) Any portion of the final design that exceeds the proposal.
> (c) Where portions within either the proposal or the final design conflict, the portion that most exceeds the requirements of the solicitation has precedence.
>
> (2) The requirements of the solicitation, in descending order of precedence:
>
> (a) Standard Form 1442, Price Schedule, and Davis-Bacon Wage Rates.
> (b) Part 1 – Contract Clauses.
> (c) Part 2 – General Requirements.
> (d) Part 3 – Project program Requirements.
> (e) Part 6 – Attachments (excluding Concept Drawings).
> (f) Part 5 – Prescriptive Specifications exclusive of performance specifications.
> (g) Part 4 – Performance Specifications exclusive of prescriptive specifications.
> (h) Part 6 – Attachments (Concept Drawings).

5

(B) Government review or approval of any portion of the proposal or final design shall not relieve the contractor from responsibility for errors or omissions with respect thereto.

(R4, tab 14 at 1437-38)

20. Second, the contract contained Federal Acquisition Regulation (FAR) clause 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997), which provides in relevant part at paragraph (a):

Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern.

(R4 tab 14 at 1418)

21. Third, Part 2, General Requirements, provided in section 00 73 04, subsection 1.5, that "[i]n case of differences between project specifications and the accompanying drawings, the specifications shall govern" (R4, tab 1 at 9).

22. Fourth, the contract contained DoD FAR Supplement (DFARS) 252.236-7001, CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000), which provides, in relevant part:

(d) Omissions from the drawings or specifications or the misdescription of details of work that are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(R4, tab 14 at 1428)

23. Following contract award, TACOSE, through OK Design, submitted its designs for government review. Government personnel reviewing the designs noticed the absence of MNS speakers in sleeping rooms and commented on 9 December 2011 that the design needed to "Provide Fire Alarm/Mass Notification audible notification in bedrooms per UFC 3-600-10N, 2-4.7.3." (R4, tab 32 at 1570, 1669-72) OK Design

6

acknowledged the comment (*id.* at 1669). Subsequently, on 2 May 2012, another government reviewer commented that "speakers are required in all occupied areas, including sleeping rooms" (*id.* at 1670).

24. TACOSE accordingly added 144 MNS speakers to the bedrooms in its design and ultimately on 16 September 2013 submitted a certified claim seeking reimbursement of €62,669.60 for the added cost (R4, tab 32). On 18 November 2013, the contracting officer issued a written decision denying the claim (R4, tab 33). The final decision was timely appealed and docketed as ASBCA No. 59157.

Insulation Disputes

25. ASBCA No. 59200 concerns disputes over two aspects of the building insulation: the insulation around the perimeter of the foundation; and the insulation under the ground floor slab (R4, tabs 38, 39).

26. The requirement for perimeter insulation appeared in Part 3 Project Program, paragraph A1030 Slab on Grade, which stated "Provide perimeter insulation" (R4, tab 1 at 181).

27. As it had with respect to the mass notification speakers, the contract incorporated by reference, and required compliance with, building codes and similar authorities. The Part 4 Performance Technical Specifications, Section Z10, General Performance Technical Specification, directed that "[a]ll Performance Technical Specification (PTS) sections must be used in conjunction with all parts of the Design Build (D/B) Request for Proposal (RFP) to determine the full requirements of this solicitation." It further directed the contractor to "[f]ollow all applicable Italian and European codes and standards for each product and installation required for the project." (R4, tab 1 at 479-80) It required the contractor to comply with applicable building codes and standards that were expressly listed in the contract, and also those that were not expressly listed in the contract, stating "All applicable norms and standards, including those incorporated by reference, shall be met, whether or not a specific Italian or European norm or standard is indicated for a product or installation" (R4, tab 1 at 479-80, *see also* at 489-500).

28. TACOSE was required to prepare designs for the foundation and building insulation that complied with the contract's minimum requirements and with applicable building codes and standards (R4, tab 1 at 180-81 (Foundations), at 233 (Foundations), at 184 (Insulation), at 249 (Insulation)).

29. The contract placed responsibility on the DOR "for coordinating the design with all applicable Italian standards and laws" (R4, tab 1 at 489).

7

30. After award, TACOSE's DOR, the OK Design Group, determined that a European building code designated EN 13969, which addresses "[f]lexible sheets for waterproofing," applied to this dormitory (R4, tab 38 at 1860 (claim); app. br. at 12). EN 13969 was not listed among the building codes that were expressly incorporated into the contract.

31. OK Design concluded that EN 13969 required a perimeter insulation membrane (R4, tab 38 at 1860 (claim); app. br. at 12). Accordingly, OK Design prepared and submitted for government approval a design that included a perimeter insulation membrane, as shown on the DOR's drawing A-501 (R4, tab 38 at 1954). The government did not otherwise direct TACOSE to provide a perimeter insulation membrane.

32. In addition to requiring perimeter insulation, the contract provided generally that the contractor shall install insulation elsewhere to meet energy savings requirements. Part 3 Project Program, paragraph B201003, Insulation and Vapor Retarder, stated:

> Provide insulation to meet the energy savings requirements.
>
> Provide a continuous air barrier to control air leakage into, or out of, conditioned spaces. The building envelope shall includ[e] all elements of the facility that are exposed to the outside environment or outside environmental conditions such as roof, walls, floors, and compartmentalized unconditioned portions of the facility. Permanently seal penetrations through the air barrier, joints in the air barrier, adjoining construction, and transitions to different air barrier materials.

(R4, tab 1 at 184)

33. Neither party has pointed to any language within the body of the contract that expressly prescribed that the contractor provide a "perimeter insulation membrane" nor language that expressly mentioned a requirement for insulation under ground floor slab, and we have found no such express language (app. br. at 10; gov't br. at 28).

34. The contract incorporated by reference Italian authorities, including Italian Legislative Decree DL 311/2006 and Italian Presidential Decree DPR 59/2009. (R4, tab 1 at 143, 500) Among other relevant provisions, the first page of Part 3 Project Program, section 1.0, Project Description, stated that the "[f]acility shall be designed and constructed according to the latest version of all applicable design

8

guides...and Italian Laws and Norms." It added that "The Design Build Contractor is responsible to have all facilities meet the appropriate certifications for that building," and "the DOR shall assert the 'Building Energy Qualification Certificate...that shall attest the building Compliance with the requirements of Italian decrees D. Leg. vo 192/2005 – 311/2006 – 115/2008 – 59/2009." (R4, tab 1 at 143)

35. According to TACOSE, after award, OK Design determined that DL 311/2006 and DPR 59/2009 required ground floor slab insulation, and that such insulation must have such thermal transmittance values that necessitated 8 cm of insulation under the ground floor slab (R4, tab 38 at 1860-61 (claim); app. br. at 13). The government did not otherwise direct TACOSE to include insulation under the ground floor slab.

36. OK Design accordingly prepared and submitted for government approval a design that included 8 cm of insulation under the ground floor slab, as shown on the DOR's drawings S-502, SD-04, and A-701 (R4, tab 38 at 1961-63).

37. The government approved the designs submitted by OK Design that included perimeter insulation membrane and 8 cm of ground floor slab insulation (R4, tab 38 at 1956-58, 1973-75).

38. Arguing that the requirements for a perimeter insulation and 8 cm of insulation under the ground floor slab constituted constructive changes, TACOSE submitted a claim on 10 October 2013 seeking reimbursement of €62,243.95* for the added cost of including these features (R4, tab 38). On 9 December 2013, the contracting officer issued a written decision denying the claim (R4, tab 39) which was timely appealed to the Board on 6 March 2014 and docketed as ASBCA No. 59200.

## DECISION

Summary judgment is appropriate where there is no genuine issue of material fact and a movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing both the absence of disputed material facts and that it is entitled to judgment as a matter of law. *Dongbuk R&U Eng'g Co.*, ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637. If the moving party makes the requisite showing, the burden shifts to the nonmovant to show that there is a genuine, material factual issue for trial. *BAE Sys. San Francisco Ship Repair*, ASBCA No. 58810,

---

* We find the claim value to be less than $100,000, based upon an exchange rate of 1.35 dollars to the euro, therefore no certication was required.

14-1 BCA ¶ 35,667 at 174,588; *Teledyne Brown Eng'g, Inc.*, ASBCA No. 58636, 14-1 BCA ¶ 35,495 at 173,998.

In these appeals, the material facts are undisputed. The disputes arise from disagreements over the interpretation of the contract requirements for this design/build contract, particularly requirements that appear in building codes or similar authorities, some of which were expressly incorporated into the contract.

## ASBCA No. 59157-The MNS Dispute

The dispute over MNS speakers stems from differences between the contract's specifications and its drawings. TACOSE argues that it relied upon drawings FA-101 and FA-601 to conclude that MNS speakers were required only in quad common rooms and not in sleeping rooms. Both drawings, it argues, depicted no MNS speakers in sleeping rooms. According to TACOSE, by insisting that TACOSE install speakers in sleeping rooms, the government constructively changed the contract. (App. br. at 11-12) The government argues that the RFP and contract, through incorporation of UFC 3-600-10N, required MNS speakers in sleeping rooms. To the extent that the contract drawings conflicted with that UFC, the government argues that the order-of-precedence clauses dictated that UFC 3-600-10N governed (gov't br. at 17-18). We agree with the government.

TACOSE is correct that drawing FA-101 depicted an MNS speaker in each quad common room and none in sleeping rooms (SOF ¶ 18). But it is incorrect concerning drawing FA-601; that drawing did not depict any rooms and thus TACOSE could not reasonably have relied upon it to determine the rooms in which MNS speakers were required (*id.*) Thus, if TACOSE focused solely on drawing FA-101 and ignored all other contract provisions and specifications, TACOSE could have concluded that MNS speakers were not required in sleeping rooms.

It is unreasonable, however, to ignore other contract provisions and specifications. The contract must be read as a whole, giving meaning to all its parts. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965). The contract incorporated UFC 3-600-10N, which expressly required MNS speakers in each sleeping room and thus conflicted with drawing FA-101 (SOF ¶¶ 14-17). The order-of-precedence clauses dictate how to resolve such conflicts. *Hensel Phelps Construction Co. v. United States*, 886 F.2d 1296, 1299 (Fed. Cir. 1989). The contract's order-of-precedence clause, NFAS 5252.236-9312, provided that Part 2, Part 4, and the Part 6 attachments took precedence over the Part 6 drawings (SOF ¶ 19). Because UFC 3-600-10N was incorporated within Part 2, Part 4, and the Part 6 attachments, this UFC took precedence over inconsistencies in drawing FA-101. Accordingly, the requirements in UFC 3-600-10N governed, and MNS speakers were required in sleeping rooms.

This conclusion is reinforced by FAR 52.236-21 and Part 2, General Requirements, which provide that in case of differences between the specifications and the drawings, the specifications govern (SOF ¶¶ 20, 21). Furthermore, DFARS 252.236-7001 provide that TACOSE must perform details omitted from drawings that are "manifestly necessary to carry out the intent of the...specifications" (SOF ¶ 22). Because UFC 3-600-10N expressly required "audible notification appliances in each sleeping room," it was "manifestly necessary" to provide speakers in sleeping rooms to carry out the intent of that UFC.

TACOSE advances two additional arguments that are unpersuasive. First, it argues that the discrepancy between the drawings and specifications was a "specification defect" for which the government is responsible (app. br. at 5). A defective specification (or defective drawing) is a breach of the government's implied warranty that satisfactory contract performance will result from adherence thereto. *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000). To recover on this basis, TACOSE must show that there was a defect, that it reasonably relied on the defect, and that the defect was latent. *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004); *Robins Maint., Inc. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir. 2001).

TACOSE cannot carry this burden, among other reasons because there was no defect. The contract contemplated the possibility of inconsistencies between drawings and specifications and dictated how to resolve them. Straightforward application of the order-of-precedence clauses resolved any conflict between UFC 3-600-10N and drawing FA-101, for the reasons already explained. Secondly, TACOSE cannot show reasonable reliance on its interpretation. It presented no evidence, such as affidavits or contemporaneous documents, showing that in preparing its proposal it actually relied upon its current interpretation, and in any event, reliance upon the drawings while ignoring other provisions and specifications in the contract would have been unreasonable. *LRV Environmental, Inc.*, ASBCA Nos. 58727, 58728, 15-1 BCA ¶ 36,042 at 176,040 (citing *William F. Klingensmith, Inc. v. United States*, 505 F.2d 1257, 1262 (Ct. Cl. 1974)) (interpretation which requires complete disregard of entire paragraphs of contract not normally considered reasonable).

We are also unpersuaded by TACOSE's contention that the large number of specifications, coupled with what TACOSE contends was insufficient time to prepare a proposal (43 days), created a latent ambiguity concerning the location of MNS speakers (app. br. at 15). Four separate contract provisions or clauses alerted bidders that in case of conflict, the specifications governed over drawings (SOF ¶¶ 19-22). TACOSE should therefore have known of the importance of the specifications and that it should not rely solely on drawings. Indeed UFC 3-600-10N – the key specification – was prominently called out in the contract text. It was listed throughout the contract as a required specification, and two separate textual provisions addressing MNS and

11

fire protection expressly noted the requirement to comply with UFC 3-600-10N (SOF ¶¶ 14-17). The requirement to comply with that UFC was patent.

For the foregoing reasons, the Board holds that the government did not change the contract requirements for MNS speakers. We grant the government's motion for summary judgment and deny appellant's motion for summary judgment regarding the MNS speakers appeal.

## ASBCA No. 59200-Insulation Appeal

At issue in the disputes over insulation is whether the government is responsible for paying to add features that were not mentioned expressly in the body of the contract, but which appellant later found to be required by government building codes and standards. TACOSE asserts that after award, its DOR, OK Design, discovered legal requirements in Italian and European building codes for a perimeter waterproofing membrane and insulation under the ground floor slab, so it added these features to the design. TACOSE argues that, because the contract text did not mention these features, the specifications were defective, and the government is responsible for the costs TACOSE incurred to provide them. (App. br. at 20) The government argues that TACOSE is responsible for the cost of these features because the contract specifications required compliance with European and Italian building codes (gov't br. at 23, 27). It should be noted that neither party contests the conclusion of OK Design that the building codes required these features (gov't post-argument br. at 9-10; app. post-argument br. at 5-6). The issue concerns which party is obligated to pay the costs of adding them.

We hold that TACOSE is not entitled to additional costs to add these features. The contract set forth general requirements for "perimeter insulation" and "insulation to meet the energy savings requirements" and directed that insulation should satisfy general performance requirements such as "Provide a continuous air barrier to control air leakage into, or out of, conditioned spaces [to] includ[e] all elements of the facility that are exposed to the outside environment"; and "Permanently seal penetrations through the air barrier" (SOF ¶ 32).

Specific requirements, such as the type, amount, or properties of insulating material, were not prescribed within the body of the contract. The contract, however, incorporated building codes and similar standards into the contract specifications. The Performance Technical Specification directed the contractor to "[f]ollow all applicable Italian and European codes and standards for each product and installation required for the project." It required the contractor to comply with applicable building codes even if those codes were not expressly listed in the contract, stating "All applicable norms and standards, including those incorporated by reference, shall be met, whether or not a specific Italian or European norm or standard is indicated for a product or installation." (SOF ¶¶ 27-28, 34) According to TACOSE, EN 13969 applied to this dormitory (SOF ¶ 30). Thus, pursuant to the Performance Technical Specification,

12

compliance with EN 13969 was a required element of the specifications even though that authority was not incorporated expressly into the contract. Italian standards DL 311/2006 and DPR 59/2009, were prominent in the contract and expressly incorporated therein, as they were called out on the first page of the first section of Part 3 Project Program (SOF ¶ 34). Accordingly, pursuant to Performance Technical Specification, compliance with those Italian authorities was also a required element of the contract specifications.

The contract placed responsibility on TACOSE and its DOR to design the dormitory in accordance with applicable requirements (SOF ¶¶ 2, 4, 5, 8, 28-29). To the extent that EN 13969 required a perimeter insulation membrane and DL 311/2006 and DPR 59/2009 required 8 cm of insulation under the ground floor slab, these features were thus part of the contract specifications.

TACOSE's argument implicitly assumes that all requirements should have been called out expressly in the contract text. This assumption is untenable in light of repeated contract language incorporating into the contract various building codes and standards external to the contract text and requiring compliance with them (SOF ¶¶ 27, 29, 34) These authorities, having been incorporated into the contract, are part of the specifications.

In rendering this decision we assume, without deciding, that TACOSE and its DOR correctly interpreted the European building code EN 13969 to require a perimeter waterproofing membrane, and correctly interpreted Italian authorities DL 311/2006 and DPR 59/2009 to require 8 cm of insulation under the ground floor slab. Even if these authorities did not require a perimeter waterproofing membrane and ground floor slab insulation, TACOSE would still be unable to recover. To recover for a constructive change, a contractor must prove (1) that it performed work beyond the contract requirements; and (2) that the additional work was ordered, expressly or impliedly, by the government. *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014); *AMEC Environment & Infrastructure, Inc.*, ASBCA No. 58948, 15-1 BCA ¶ 35,924 at 175,594. TACOSE is responsible for the costs of features that exceed the contract requirements if it voluntarily includes them in its design. *Northrop Grumman Systems Corp. Space Systems Division*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,243 (holding that contractor who acted at its own initiative is not entitled to costs for a constructive change). Other than by requiring compliance with EN 13969, DL 311/2006, and DPR 59/2009, the government did not direct TACOSE to include either a perimeter insulation membrane or insulation under the ground floor slab (SOF ¶¶ 31, 35). Accordingly, if those authorities did not actually require a perimeter insulation membrane or insulation under the ground floor slab, TACOSE could not establish that these features were ordered, expressly or impliedly, by the government.

TACOSE reiterates its argument that the large number of specifications and building code references, coupled with what TACOSE contends was insufficient time to prepare a proposal (43 days), created a latent ambiguity concerning the insulation

13

requirements (app. br. at 15). This argument is unpersuasive. The time limitations for a proposal and the complexity of the RFP package were apparent. Having elected to submit a proposal in these circumstances, TACOSE accepted the ground rules under which the proposal was to be submitted, and it is too late for TACOSE to complain.

For the foregoing reasons, the Board holds that there was no specification defect regarding perimeter insulation or ground floor slab insulation. We grant the government's motion for summary judgment and deny appellant's motion for summary judgment regarding the insulation appeal.

CONCLUSION

Appellant's appeals in ASBCA Nos. 59157 and 59200 are denied.

Dated: 4 January 2017

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59157, 59200, Appeals of A.T.I. TACOSE S.C.a R.L., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14